EXTER *et al.* v. SAWYER *et al.*; SAWYER, *Appellant.*

### Division Two, November 21, 1898.*

1. **Trusts**: PROMOTER: PURCHASE OF REAL ESTATE. Where a promoter of a syndicate or company for the purchase of real estate is not the owner thereof at the time of its organization, and only has an option on the property which he subsequently sells at a profit to the company, he is liable in damages. And if he purchases the property after he has begun promoting the enterprise and sells it to the company, he must inform the directors that the property belongs to him, or else the sale will be invalid.

2. ———: ———: ———: DUTY TO ASSOCIATES. One who acts for a company in promoting and organizing it, and in purchasing land, violates his obligations of good faith if he conceals from the subscribers to the company's stock and the directors, the fact that he purchased it at a much less sum than that at which he sold it to the the company. And if he fails to advise them of these facts, he must be held to respond in damages.

3. ———: ———: ———: ———: SUIT BY STOCKHOLDER. In such case a stockholder, who has informed the corporation of the fraud practiced upon the stockholders by the promoter and has requested it to bring suit against him for the fraud, which it declines to do, has the right to sue in equity in his own behalf and in behalf of all other stockholders who may wish to come in, making the promoter and the corporation defendants.

NOTE.—Decided October 17, 1898. Motion for rehearing filed; overruled November 21, 1898.

4. ———: ———: ———: FRAUD. A promoter who acts as agent of a company in purchasing lands, and transfers them to it for a much larger sum than he paid for them, without disclosing to the company the amount paid, is guilty of fraud.

5. Agency: SPECULATIONS. An agent can not speculate with the rights of his principal.

*Appeal from St. Louis City Circuit Court.*—HON. P. R. FLITCRAFT, Judge.

AFFIRMED.

*J. M. Holmes* for appellant.

(1) Appellant was under no obligation to disclose the nature or extent of his interest to the company or to its stockholders, as he occupied no fiduciary relation to them, and was not accountable to them for his profits, not having done or said anything to create any such right on their part. *Ladywell Mining Co. v. Brooks*, 35 Ch. D. 400; *Erlanger v. Phosphate Co.*, 3 App. 1218; *In re Ambrose Lake Tin Co.*, 14 Ch. D. 390; *In re Cape Breton Co.*, 29 Ch. D. 795; *Densmore Oil Co. v. Densmore*, 64 Penn. 43; *Ely v. Hanford*, 65 Ill. 267; *Higgins v. Lansingle*, 154 Ill. 301; *Gover's* case, 1 Ch. D. 182; *Plaquemines Tropical Co. v. Buck*, 52 N. J. Eq. 219; *South Joplin Land Co. v. Case*, 104 Mo. 572; *Simons v. Vulcan Oil Co.*, 61 Penn. 202; *Burbank v. Dennis*, 101 Cal. 90; *Denny v. Peak*, 14 App. Cas. 337; *Peek v. Gurney*, L. R. 6, H. L. 377; *Arkwright v. Newbold*, 17 Ch. D. 301; *Coil v. Pittsburgh College*, 40 Penn. 439; Lawson on Contracts, sec. 220; Lindley on Companies [5 Ed.] 70; *Lindsay Petroleum Co. v. Hurd*, L. R. 5, P. C. 221; *Clarke v. Dickson*, 6 C. B. (N. S.) 453; *Low v. Bouviere*, 3 Ch. D. 105; *Kounteze v. Kennedy*, 147 N. Y. 124. (2) The right of action shown in the evidence, if any, is a right in favor of individual plaintiffs only, and the recovery in favor of plaintiffs as trustees for anything more than they had

shown to be due to them as individuals was erroneous. *Getty v. Devlin*, 54 N. Y. 403; s. c., 70 N. Y. 504; *Dole v. Woodridge*, 135 Mass. 140; *Brewster v. Hatch*, 122 N.Y. 349; *Teachout v. Van Hoesen*, 76 Iowa, 113; *Dunphy v. Traveller Newspaper Co.*, 146 Mass. 497; *McDougall v. Gardiner*, 1 Ch. D. 13. (3) No cause of action as to the "Ramona" tract in favor of any one, either company or stockholder, has been shown; but, on the other hand, the evidence affirmatively shows that no cause of action as to such tract exists, and that portion of the decree allowing a recovery as to such tract is in conflict with the evidence and is erroneous. *Parker v. Nickerson*, 137 Mass. 487; *Kimber v. Barker*, 8 Ch. D. 56; *Bentinck v. Fenn*, 12 App. Cases, 652; *Higgins v. Lansingle*, 154 Ill. 378; *Ely v. Hanford*, 65 Ill. 267; *In re Cape Breton Co.*, 29 Ch. D. 795.

*Sim T. Price* and *D. D. Fassett* for respondents.

(1) Sawyer having promoted the organization of the Edgefield Company for the expressed purpose of buying the two tracts of land, and having acted for the company as its agent for the purchase of the two tracts of land, occupied a fiduciary relation to the subscribers for stock and to the proposed company, and could make no profit out of the sale of said lands, without making full disclosure of the fact that he was the owner of the lands and was the proposed seller of the lands to the company to be organized. 1 Beach on Railway Corps., sec. 1-2 and 4; *Emma Silver Mining Co. v. Lewis*, 4 C. P. D. 407; *Twycross v. Grant*, 2 C. P. D. 541; *Whaley Bridge C. P. Co. v. Green*, 52 B. D. 109; *Sidney & Wigpool Iron Ore Co. v. Bird*, 31 Ch. D. 339; 1 Cook on Stockholders, sec. 651; *New Sombrero Co. v. Erlanger*, 5 Ch. D. W. 73; *Simons v. Vulcan Oil Co.*, 61 Pa. St. 202; *Brewster v. Hatch*, 122 N. Y. 349; *Eneau*

*Rieger*, 105 Mo. 675; *South Joplin Land Co. v. Case*, 104 Mo. 572; Alger on Promoters, secs. 28–30–32 and 33. (2) If Sawyer had purchased and paid for the two tracts of land, prior to taking any steps for promoting the Edgefield Company to take it off his hands, his acts and declarations in his subsequent relation of promoter of the Edgefield Company, made it his legal duty to treat the property as bought for the company and not for himself, and he is accountable to the company for the secret profit made out of the deal. Alger on Promoters, etc., sec. 51; *Simons v. Vulcan Oil Co.*, 61 Pa. St. 292; *Ex-Mission Land & W. Co. v. Flash*, 97 Cal. 610; *Burbank v. Dennis*, 101 Cal. 90. (3) If the corporation is under the control of the guilty parties, or refuses to sue when requested by a stockholder to do so, then the stockholder himself may bring a suit in equity in his own behalf and in behalf of all other stockholders similarly situated, making the corporation and the guilty parties the defendants, and compel them to make good to the corporation the corporate money or property lost by the wrongful acts. 2 Cook-Stock & Stockholders, secs. 701, 735, 737, 738, 740, 741 and 743; 1 Morawetz, Corps. [2 Ed.], secs. 271 and 272; Alger on Promoters, sec. 122. (4) The rights of the innocent stockholders will be protected, although punishment can not be apportioned among the guilty. 1 Morawetz, Corps., sec. 294; *Ex-Mission Land & Water Co. v. Flash*, 97 Cal. 610. (5) The motive of a stockholders in instituting suit is immaterial. 1 Morawetz, Corps., sec. 259; 2 Cook on Stocks, etc., sec. 736.

BURGESS, J.—About the middle of March, 1890, the defendant, Charles H. Sawyer, having conceived the idea of forming a company for the purpose of buying a certain tract of land of about one hundred acres in

VOL. 146 mo—20

St. Louis county, submitted the following instrument of writing and another to be hereafter mentioned to the plaintiff and the individual defendants, and the Farmer's Co-operative club and induced them to become subscribers thereto for the amount set opposite their respective names.

"WHEREAS, C. H. Sawyer is about to form a company for the purpose of buying a certain tract of land of about one hundred acres, in St. Louis county, lying on and south of the Wabash railroad, opposite Woodland station, and being about 400 yards west of Jennings station, as shown by plat attached hereto, said land to be bought at the price of $500 per acre, or $50,000.

"Now, therefore, the undersigned hereby agree to bind ourselves to take stock in said company for the number of shares and amount set opposite our respective names, one fifth of amount subscribed to be paid at the time of signing, or when called upon to pay by C. H. Sawyer, the other four fifths to be paid in monthly instalments equal to ten per cent of the amount subscribed.

"Said company shall be incorporated and known as the Edgefield Land and Improvement Company, or some other suitable name."

Sawyer began procuring subscriptions to this list about the middle of March, 1890. It took a week or ten days to get the necessary amount to buy the land subscribed. The subscriptions were all paid to Sawyer. As soon as a sufficient amount was subscribed to pay for this tract of land, Sawyer conceived the idea of enlarging the proposed company, increasing its capital, and selling to it a certain tract of land, known in this litigation as the "Ramona" tract, for which purpose he issued a second subscription list, which was in words and figures as follows:

"WHEREAS, C. H. Sawyer has secured subscriptions to the amount of $50,000 for the purpose of organizing and incoroporating a stock company to be known as the Edgefield Land and Improvement Company (or some other suitable name), to purchase a tract of land of one hundred (more or less) acres situated on the Wabash railroad, at or near Woodland station; the subscriptions to said stock to be paid as follows:   One fifth at time of signing, or when called for by C. H. Sawyer; the balance, four fifths, to be paid in monthly instalments (commencing thirty days from March 13) equal to ten per cent of the amount subscribed; and

"WHEREAS, it is desired by a majority of the stockholders to increase the capital stock of said company to $100,000 for the purpose of purchasing an additional tract of land of 142 acres (more or less) at the sum of $350 per acre, said land situated on or near Narrow Gauge railroad, Carsonville, Mo., as shown by plat accompanying this instrument; said subscribers to the original $50,000 of stock to be allowed to subscribe to the new stock an equal amount of their first subscription, and pay five per cent on said new stock at time of signing, or when called for by C. H. Sawyer, and ten per cent of amount subscribed every thirty days, from date thereof, until the remaining ninety-five per cent shall have been paid.   The new subscribers, or those not subscribers to the original stock, or original subscribers subscribing to more stock than their original shares, are to pay one fourth of the amount subscribed in cash at the time of signing, or when called for by C. H. Sawyer, and the remaining three fourths to be paid in monthly instalments equal to ten per cent of the amount subscribed.

"Now, therefore, we, the undersigned, hereby agree and bind ourselves to take stock in said company

for the number of shares and amounts set opposite our respective names, subject to all the terms and conditions hereinbefore mentioned."

All of the payments for stock called for by the subscription lists were to Sawyer, and by him deposited to his personal account and used by him in the acquisition of the two tracts of land for the acquirement of which he secured the organization of the Edgefield Land and Improvement Company. Sawyer first contemplated purchasing the Jennings tract, in January or February, 1890, and about the same time procured an option upon it in writing from Jennings, at $300 an arpent. On March 15, 1890, Sawyer, and Jennings entered into a further agreement in regard to the same tract, at which time Sawyer paid him the sum of $1,000 earnest money.

This contract is as follows:

"McLAREN REAL ESTATE AND INVESTMENT CO.

"Rooms 224 and 225 Commercial Building.

"St Louis, March 15, 1890.

"Received of McLaren Real Estate and Investment Company the sum of $1,000 on account of the purchase of a certain parcel of unimproved property lying in St. Louis county, and being a part of the Jennings survey by Solomon and Schultz, and bounded on the east by the land of Mrs. Duryea, on the west by estate of D. A. January, on the north by Woodland station and on the south by Mary E. McCleny, containing 100 arpents or more, known as the northern part of lot fourteen, being the same conveyed by Robert Jennings to the Connecticut Mutual Life Insurance Company to secure the incumbrance of $10,000 herein mentioned, on which is situated tenant houses, which property is this day sold to Mr. C. H. Sawyer for the total sum of $300 per arpent, payable on terms

of $20,000 in cash and the balance to be assumed, $10,000 now standing against the property and due May 17, 1891, with six per cent interest, possession given when deeds are passed, and said Sawyer is hereby authorized to collect rents for 1890 now due. The title of said property to be perfect and to be conveyed by warranty deed free from liens and incumbrances except as to the taxes for the year 1890, which the undersigned purchaser agrees to pay. If, upon examination, the title proves to be defective and can not be made good, within a reasonable time, the sale shall be off and the earnest money returned, as also a reasonable fee for the investigation of title.

"The said C. H. Sawyer is accorded thirty days' time from this date to close the above purchase and have the title investigated. I agree to the above terms and conditions, (Signed) C. H. Sawyer, (Seal); Robert M. Jennings, (Seal); McLaren Real Estate and Investment Company, Theodore DeForest, President. Witness, T. W. Copening."

On April 14, 1890, Jennings and wife conveyed the "Jennings tract" to C. H. Sawyer, the nominal consideration in the deal being $50,000. The real consideration was $35,100. The nominal consideration was inserted at Sawyer's request. On April 28, 1890, Sawyer and wife conveyed to the Edgefield Land and Improvement Company the "Jennings Tract" reciting in the deed a consideration of $80,283.

Sawyer says he took the first steps towards acquiring the title to the "Ramona tract," in December, 1889. His efforts to acquire the "Ramona tract" at that time resulted in the execution of the following agreement between Sawyer and the owners of said "Ramona tract."

"St. Louis, December 31, 1889.

"*M. M. Fitzgerrell, Esq., No. 9 North Eight Street, City.*

"Dear Sir:—I hereby propose to trade for the 142.88 acres located at Carsonville on the Narrow Gauge railroad, and running along the Natural Bridge road in St. Louis county, Mo., as shown by plat now in my possession, on the following terms, to wit: I will give my 1200 acre place, located in Ellis county, Texas, and known as the Brown farm (of which you have plat), with an incumbrance of eighty-five hundred dollars, with $850 interest due the 18th day of March, 1890, balance due in one and two years from 18th of March, 1890, and turn over to you or your party rent notes amounting to $1,023, due 15th day of September, 1890, with twelve per cent interest after maturity, and hay contract, also all implements now on the place belonging to me and represented in description I gave Mr. Sass, and will take the 142.88 acres above mentioned, subject to incumbrance of $14,000, due in three years at six per cent interest, and also give an additional incumbrance on said 142.88 acres of $8,500, one half with ten per cent interest, due 18th of March, 1890, balance due in one and two years from 18th of March, 1890, with ten per cent interest from date. Title of both properties to be good with the exception of the incumbrances herein named. You to furnish certificate of title by Sterling & Webster Abstract Co. and Aug. Gehner & Co., of this city. I will furnish same by reliable abstracter in county seat of Ellis county, Texas. And agree further to give you twenty days from this date in which to examine my property. And if you find on such examination it to be as represented, agree to close trade on such basis. The representations made are as follows, viz:

"The deed will call for 1,145 acres, but is con-
sidered by many that it will overrun this largely.
That the land is located in Ellis county, Texas, about
eight miles from Ennis and about two miles from
Faulkne station, on branch of the Houston & Texas
Central R. R. That the soil is a black, waxy and
sandy loam. There is now 212 3-4 acres, more or less
under cultivation or to be put in cultivation, as shown
in contracts; also 150 acres, more or less, under hay
contract. The contracts and notes above mentioned
hereto attached. Said contracts and notes to be trans-
ferred without recourse on me. It is further under-
stood that I do not claim that the school house, church
and store are my property, but are located on my land
according to survey made by George H. Hogan, sur-
veyor of Ellis county, Texas.

"C. H. SAWYER."
"Accepted to date, January 3, 1890.
"M. M. FITZGERRELL, Agent.
"WM. E. BERKELY, Agent."
This agreement was changed by another in writ-
ing, which is as follows:

"McLAREN REAL ESTATE AND INVESTMENT COMPANY.

"Rooms 224–225 Commercial Building.

"ST. LOUIS, April 4, 1890.
"Received of C. H. Sawyer the sum of ten dollars
as earnest money, on account of the purchase money of
a certain tract or parcel of land located, lying and
being in the county of St. Louis, and State of Missouri,
and described as follows:

"One hundred and forty-two acres of land situated
in St. Louis county, Mo., known as the Clement Wood-
ward farm, being and lying in section 22, township 46
north, range 6 east, which lies south of the Natural
Bridge road, and east of the Hanley road, where said

road crosses said Natural Bridge road at Carsonville, and being at the southwest corner of said crossing.

"Which property is this day sold to C. H. Sawyer, for the total sum of $50,000, payable as follows: $5,000 in cash and a warranty deed to 1,145 acres in Ellis county, Texas, now owned by said Sawyer, subject to $8,500 incumbrance, bearing ten per cent interest.

"Title to said 142.88 acres to be perfect and to be conveyed by warranty deed, and to be clear of liens and incumbrances, except an incumbrance of $14,000 bearing six per cent interest, which the undersigned purchaser agrees to assume.

"If, upon examination, the title proves to be defective and can not be made good, within a reasonable time, the sale shall be off and the earnest money returned, as also a reasonable fee for investigation of title not to exceed $50.

"The said parties hereto are accorded thirty days' time from this date to close the above purchase and have the title investigated.

"I agree to the above terms and conditions. Signed in duplicate.

"——. E. BERKELEY, [SEAL].
"C. H. SAWYER.    [SEAL]."

"FARMERS' CO-OPERATIVE CLUB,
"By M. M. FITZGERRELL, Mgr.

"This receipt to be returned to the McLaren Real Estate and Insurance Company on closing purchase."

Under this agreement Sawyer paid $10 earnest money to bind the contemplated trade, and on April 24, 1890, received a deed for the "Ramona tract." On April 26, 1890, Sawyer conveyed to the Edgefield Land and Improvement Company the "Ramona Tract," by a deed in which the consideration was stated to be $80,000.

Sawyer testified that with the exception of De-Forest, who knew what the real consideration was for the "Jennings Tract," and possibly Ewing, Cheney and Babcock, he never disclosed to any of the subscribers to the stock of the Edgefield Land and Improvement Company, the real price at which he bought either the "Jennings Tract" or the "Ramona Tract."

He also testified that by express agreement between himself, Fitzgerald and Chew, his "Texas Equity" was to be taken in the Ramona deal at a valuation of $31,000. To a committee of the stockholders appointed to ascertain the amount of claims asserted by Sawyer against the Edgefield Company, he gave the following statement: " 'Ramona Tract' cost me, option, $22,500. Equity, $16,500. Total, $39,000. Option, December 31, 1889, closed April 4, 1889. Berkeley's deed, April 24, 1890. Woodward deed to Berkeley, April 11, 1890; deeded by Sawyer & Company, April 26, 1890. Total cost to C. H. Sawyer of the two properties, $74,100; total profit to Sawyer, $26,983; price paid Sawyer as agreed $101,083." This statement was furnished about May, 1892.

He further stated that Ewing and DeForest knew that he had traded his Ellis county property in Texas for the Ramona tract, but that he told no one else that he had traded said property. That in all this matter from first to last, no one ever asked him the question, as to whether he owned the land, or had an option on it, or was selling it at a profit, or ever intimated a desire to know who owned it or what his relation to it was, except Mr. Bannantine. That on the fifteenth of March (1890), when he signed the contract for purchase of the land, he was worth in real estate, bank stocks and other stocks the sum of $200,000. That he could not tell what sum of money he had deposited in

any bank about the time when the "Jennings Tract" and "Ramona Tract" were purchased.

After having his attention called to his notice of March 17, 1890, to Captain Bull, informing him that the subscriptions for the first $50,000 had been completed, Sawyer was asked: "*Q.* What do you say now as to your efforts to organize this company prior to March 15, 1890, when you closed your option with Dr. Jennings?" and answered: "*A.* I stated I didn't know how many days. It is possible it was a few days before that. I am not positive as to dates. I can not remember. I am inclined to think from this document that I commenced to organize this company a few days before I closed the option with Dr. Jennings, if it was closed at that date. I know of no reason why I waited till March 15 to close the option with Dr. Jennings, unless it might have been a matter of convenience to me. I don't remember whether it was or not," etc.

To Captain William Bull, Sawyer in substance stated that he had an option on the "Jennings tract" at $500 per acre; that the option would run out soon, and it was necessary to get sufficient money to take it in; that he did not have enough himself and wanted a few of his friends to go in with him, and put up the money and secure the property; that there was a party waiting to take the property at $550 an acre, and that the price that he was to pay for it, $500, was considerably less than the actual value; that there were certain facts that were known only to himself and a few others that would increase the value of the property very much; that he had raised quite a sum of money to induce the Wabash railroad to put on additional trains, and as soon as that would become known the property would be worth a great deal more money; that he was a subscriber and was putting in all the money he could

afford, and had converted some securities in order to get some money to put into the investment and thought it a good thing; that he never at any time intimated to Captain Bull that he was the owner of the property, but in every conversation with Captain Bull spoke of buying the property for the Edgefield Company. He further stated to Captain Bull that he was getting up the scheme and would act for the syndicate in the acquisition of the property and that as soon as the company was organized he was to be its secretary, and until its organization he was to act for the subscribers; that all moneys were by the subscribers to be paid to him; that he never told Captain Bull that he was acquiring either of the tracts of land for a less sum than appeared on the face of the two subscription lists, but that all parties were going in together on the ground floor and would share any profit that was made.

Captain Bull's subscription to the capital stock of the Edgefield Company was made not later than March 10, 1890.

To Fred C. Exter, Sawyer stated that the option on the "Jennings tract" would expire about the middle of April, 1890, and that they would have to fill the subscription list and get enough money on or before that time, because Mr. Jennings would not wait longer than that time.

To George A. Bannantine, Sawyer stated that he represented a syndicate which was organized to buy the Jennings tract for the sum of $500 per acre under an option and that he was one of the syndicate.

To R. S. Logan, a subscriber to both lists, Sawyer stated that he was organizing a syndicate for the purpose of purchasing the "Jennings tract" and the "Ramona tract;" that he was one of the syndicate and would manage the business of the company; that

he did not state who owned the "Jennings tract," nor did he state anything as to the costs of said tract, except what was shown on the subscription paper. R. S. Logan subscribed for his stock about the twelfth or thirteenth of March, 1890.

To John J. Broderick, a subscriber to said Edge-field stock, Sawyer stated that he had an option on the land that had to be closed at a certain time, and that all subscribers to the stock would "stand on the same basis" in the purchase of the two tracts of land, and that he was acting for the stock subscribers and the contemplated company in purchasing the two pieces of land;· that Sawyer never told Mr. Broderick that he was the owner of the two tracts of land and pro-posed to sell them to the company he was then forming to buy lands; that he never told Broderick that he would make a profit out of the sale of the lands to the proposed company.   Broderick testified that he "never heard of such a preposterous proceeding until this suit· was begun."

To Benj. Lynds, a subscriber to the stock of the Edgefield Company, Sawyer stated, You see my name on the subscription list for $5,000 of the stock. "You can see how much faith I have in it; I am going to take more if I can get the money to pay for it." That Sawyer stated to him that he was one of the syndicate, and that Mr. Ewing, in Sawyer's presence, stated that Sawyer was to manage the company for the sub-scribers; that Sawyer did not tell Mr. Lynds that he owned the two pieces of property for the acquisition of which the Edgefield Company was formed, and intended to sell the lands to such company; nor did Sawyer say anything about the costs of the properties to him, the subscription list indicated what the lands would cost. Lynds testified that he first knew that Sawyer had made profit out of the lands after this suit was brought.

To Wm. H. Mayo, a subscriber to the Edgefield stock, Sawyer stated: That he had an option on the "Jennings tract" at $350 or $500 an acre or arpent; that they were to form a syndicate with a number of other gentlemen whose names were given, and who were said to be friendly to the project; that they could make some money out of it by dividing it up and selling it out in lots; that he (Sawyer) was one of the subscribers to the stock; that the price was too big for him to handle alone, or that he would gladly handle it alone; that he had subscribed as much as he could afford to, and desired to have other parties subscribe and form a syndicate and subdivide and improve it, and sell it for whatever we could. He further stated to Mayo that he was to represent the parties and manage the business, and that all business was to be negotiated through him, or the McLaren Real Estate Company. Mayo testified that Sawyer never informed him that he owned the lands, but that he had an option.

Theodore DeForest, a witness for defendants, testified that Mr. Broderick correctly summarized the transaction, when he stated that "all parties were to stand on the same floor."

James F. Ewing, a witness for defendants, testified that the first time he heard that Sawyer had acquired the "Jennings Tract" at $300 an arpent and sold it to the Edgefield Company for $500 an arpent, was after this suit was begun, and that he was as much surprised by such a disclosure as any one.

There was evidence introduced by plaintiffs tending to show that at the time Sawyer exchanged his "Texas farm" for the "Ramona tract," the entire value of the "Texas farm" was $10,000 or $12,000, about the amount of the incumbrance thereon. Defendants introduced evidence tending to show that at the time

stated, the equity in the "Texas farm" was worth $10,000 to $25,000. The court found the equity in said farm to be of the value of $5,000.

The evidence on the part of plaintiffs tended to show that at the date of the purchase of the "Ramona tract" by Sawyer, its full value was from $19,000 to $20,000, while upon the part of defendants it tended to show that the value of "Ramona tract" at that time was from $25,000 to $50,000.

After the two tracts of land were conveyed by Sawyer to the Edgefield Land and Improvement Company, the Edgefield Company executed a deed of trust on the "Jennings tract" for $20,000 to the Connecticut Mutual Life Insurance Company, out of which the $10,000 deed of trust existing on said tract was paid and the remaining $10,000 was paid to Sawyer. The Edgefield Company also executed to Sawyer a second deed of trust on the "Jennings tract" for the sum of $30,000. This second deed of trust for $30,000 has been paid off until but $5,200 remain unpaid, the note being held by Sawyer.

The Edgefield Company at the same time executed to Sawyer its deed of trust on the "Ramona tract" to secure the sum of $30,000, a portion of the profits made by him through the sale of the two tracts of land to the Edgefield Company.

Fred C. Exter, one of the subscribers to the Edgefield stock, afterward became satisfied that Sawyer had abused the confidence imposed in him and, in violation of the duty due from him to the proposed Edgefield Company, had wrongfully and fraudulently appropriated a large portion of the values of said Edgefield Company. After having come to this conclusion said Exter made upon the directors of the Edgefield Company a demand in writing, requesting them to institute against said Sawyer a suit for the cancellation of the deeds of

trust and notes wrongfully and illegally given to said Sawyer, and for the recovery from said Sawyer of all moneys of the Edgefield Company that had been wrongfully appropriated by him. In response to this demand of Exter the Edgefield Company refused to institute such suit. He thereupon instituted it himself. After the suit was filed a committee of the stockholders of the Edgefield Company was appointed to investigate the truth of the charges made in Exter's petition against Sawyer. An investigation of the charges was made by the committee. The committee made its report with the result that the amended petition in this case was filed, and the numerous parties plaintiff therein were joined with said Exter. A trial of the cause resulted in the rendition of a judgment and decree in favor of plaintiffs, in trust for the use of the Edgefield Land and Improvement Company, and against the said Charles H. Sawyer, for the sum of $15,052.31, as being the profit made by the said Sawyer upon the "Jennings" tract, and for the sum of $33,923.40, as being the profit made by the said Sawyer upon the "Ramona" tract, making the total judgment of $49,975.71 as being the amount due from said Sawyer to the said Edgefield Land and Improvement Company, arising out of the matters set forth in the petition; and further ordered and decreed that the case be dismissed as to Theodore DeForest, James F. Ewing, T. J. Cheney, the Third National Bank, and that the defendant Sawyer pay the costs of the suit. Afterward and in due time a motion for new trial was filed by the defendant Charles H. Sawyer, which was overruled and an appeal to this court was duly taken by the said Sawyer.

The court made a finding of facts substantially as hereinbefore stated.

It is insisted by defendant Sawyer that he occupied no fiduciary relation to the company, was not

accountable to them for his profits, not having done or said anything to create any such right upon their part, and therefore he was under no obligation to disclose to them the nature or extent of his interest in the lands to the company. Upon the other hand it is contended by plaintiffs that Sawyer, having promoted the organization of the Edgefield Company for the expressed purpose of buying the two tracts of land, and having acted for the company as its agent for the purchase of the two tracts of land, occupied a fiduciary relation to the subscribers for stock and to the proposed company and could make no profit out of the sale of the lands, without making full disclosure of the fact that he was the owner of the lands and was the proposed seller of them to the company to be organized.

It is indisputable that Sawyer was promoter of the Edgefield Land and Improvement Company, and that he had an option only on the land in question at the time of the organization of the company, and if with respect to such land he occupied no fiduciary relation to the corporation this action can not be maintained. It was in January or the early part of February, 1890, that Sawyer secured an option on the Jennings tract, and about the ninth or tenth of March next thereafter he determined to organize a corporation for the purpose of selling to the same said land. He did not then at the time of acquiring the option occupy a fiduciary relation to the corporation with respect thereto. In such circumstances it was said in *Densmore Oil Co. v. Densmore*, 64 Pa. St. *loc. cit.* 49. "There are two principles applicable to all partnerships or associations for a common purpose of trade or business, which appear to be well settled on reason and authority. The first is, that any man or number of men, who are the owners of any kind of property, real or personal, may form a partnership or association with

others, and sell the property to the association at any price which may be agreed upon between them, no matter what it may have originally cost, provided there be no fraudulent misrepresentation made by the vendors to their associates.  They are not bound to disclose the profits which they may realize by the transaction.  They were in no sense agents or trustees in the original purchase, and it follows that there is no confidential relation between the parties which affects them with any trust.  It is like any other case of vendor and vendee.  They deal at arms' length.  Their partners are in no better position than strangers. They must exercise their own judgment as to the value of what they buy.''  But where the promoter is not the owner at the time of the organization of the company, and only has an option on the property which he subsequently sells at a profit to the company or corporation which he causes to be formed, he is liable in damages to the subscribers for the stock.  And, if after he begins promoting he purchases property and then sells it to the company, he must inform the directors that the property belongs to him, otherwise the sale will be invalid.  Cook on Stock and Stockholders [3 Ed.], sec. 651  There are authorities, however, which go further and hold that a promoter occupies the same position towards the company or corporation which he promotes as a trustee, steward or agent.

Thus in *New Sombrero Phosphate Company v. Erlanger*, L. R. 5 Ch. Div. *loc cit.* 118, it was said: ''A promoter is, according to my view of the case, in a fiduciary relation to the company which he promotes or causes to come into existence. If that promoter has a property to sell to the company, it is quite open to him to do so; but upon him, as upon any other person in a fiduciary position, it is incumbent to make full

and fair disclosure of his interest and position with respect to the property. I can see no difference in this respect between a promoter and a trustee, steward or agent."

So in the *South Joplin Land Co. v. Case*, 104 Mo. 579, it was said that persons who "project and form a corporation, by soliciting and procuring others to subscribe for and take shares of stock, for the purpose of selling or turning over to the company property which they own, or have a right to acquire by executory contract, do occupy a double position. On the one hand they represent their own interest in respect to the disposition of the property; on the other, they represent the proposed corporation." The court said further: "A vendor is a promoter, and is bound to protect the interests of those who ultimately constitute the company. . . . . . He assumes this duty if he assumes to act for them, or if he induces them to trust him or to trust persons who are under his control, and who are practically himself in disguise. He also assumes such duty if he calls the company into existence in order that it may buy what he has to sell; but he does not assume such duty by negotiating with persons who have themselves assumed that duty, and who are in no way under his influence." See, also, *Quinlan v. Keiser*, 66 Mo. 603.

According to the rule thus announced Sawyer was agent for the Edgefield Company in acquiring the two tracts of land. This was not only shown by the verbal evidence, but it is shown by the recitals in the subscription lists in the first of which it is said, that "Sawyer is about to form a company for the purpose of buying a certain tract of land of about one hundred acres, the Jennings tract for $500 per acre, or $50,-000; that all subscriptions for stock are to be paid

to him; and that he is a subscriber for $5,000 of the stock of the Edgefield Company, which is being organized by him for the express purpose of buying the Jennings tract."

In the second subscription list it is stated that Sawyer has secured subscriptions to the amount of $50,000 for the purpose of organizing and incorporating a stock company to be known as the Edgefield Land and Improvement Company to purchase a tract of land; . . . . . . . that it is desired by a majority of the stockholders to increase the capital stock of said company to $100,000 for the purpose of purchasing an additional tract of land, . . . . . . . the "Ramona Tract;" that all stock subscriptions shall be paid to C. H. Sawyer, who also subscribed for $5,000 of this increased stock.

Sawyer acted for the company in organizing it, and in securing its incorporation, and in purchasing the two tracts of land; he concealed from the subscribers of stock and the directors of the company the fact that he had purchased each tract of land at a much less sum than that at which he sold it to the company, when it was his duty, owing to his relations with the company and its stockholders, to speak out and fully advise them with respect thereto, and in his failure to do so he violated his obligation of good faith which he owed to his associate stockholders, and for which he must be held to respond in damages.

Another insistence is that error was committed by the trial court in proceeding upon the theory that, if a wrong had been committed by a promoter against subscribers or stockholders in procuring their subscriptions, which wrong was not common to all stockholders, the remedy lies with the corporation, and consists in an action by it.

This action is not bottomed upon the ground of fraud practiced by Sawyer upon individual stockholders, but upon the ground of fraud practiced upon the company, to which the lands were sold by Sawyer at a greatly advanced price over what he paid for them, when by the rules of honesty and fair dealing it was entitled to them at the same price that he paid, in the absence of knowledge of that fact, and an agreement to take them at a fixed sum. The corporation after being informed by Exter of the fraud practiced upon the stockholders in the sale of the land to it by Sawyer refused to take action in the matter and to bring suit against him for the fraud, and in such circumstances the plaintiff, Exter, being a stockholder had the right to sue in equity in his own behalf, and in behalf of all other stockholders who might wish to come in, making the corporation and the guilty parties the defendants. 2 Cook on Stockholders [3 Ed.], sec. 701. As Sawyer was the agent of the company in the purchase of the lands and transferring them to it, for a much larger sum than he paid for them without disclosing to the company the amount paid for them by him, he was guilty of fraud, upon which a cause of action accrued to the company regardless of the fact that he may never have stated to the company at any time the amount paid by him for the land. An agent must act fairly with his principal. He can not speculate off of him with respect to matters in which he is agent.

In Morawetz on Private Corporations [2 Ed.], sec. 272, it is said: "It is true that an act committed by a portion of the members of a corporation can not, in the nature of things, be a wrong against the whole company; it can be a wrong only against those shareholders who were not parties to the act. Yet, it is impossible, under these circumstances, to work out the exact rights of the individual shareholders, except by regarding

the corporation as a separate entity, and by treating the wrong as a wrong against the whole corporation. Each shareholder has an interest in the corporate concern as an entirety, and his rights must be protected accordingly. A recovery by the corporation as an entirety against a portion of its members would inure to the benefit of each shareholder in proportion to his interest. These shareholders who were charged with liability irrespective of their membership in the corporation would be recouped to the extent of their interests through the enhancement of the value of their shares, and exact justice would thus be meted out to all the parties." The argument that it would be unfair to allow those shareholders who were not wronged to benefit by a recovery in the name of the corporation is best answered by Sir George JESSEL in *New Sombrero Phosphate Co. v. Erlanger*, *supra*, as follows: "If the argument were once allowed to prevail, it would only be necessary to corrupt one single shareholder to prevent a company from ever setting the contract aside. It may be said you give to the shareholder who was a party to the fraud a profit, because he will take it in respect of his shares, and since, as between conspirators there is no contribution, therefore his brother conspirators who are made liable for the fraud can not make him repay his proportion. But the doctrine of this court has never been to hold its hand, and avoid doing justice in favor of the innocent, because it can not apportion the punishment fully amongst the guilty." 1 Morawetz on Private Corporations [2 Ed.], sec. 294.

It seems that DeForest was the only stockholder and director of the company, who was aware that Sawyer had made a profit out of his sale of the lands to the company. He testified himself that he did not disclose to any of the stockholders, excepting Babcock

and Chener, nor to any of the directors of the company, the price which he paid for the lands, and while the considerations expressed in the deeds to him for the two tracts of land were $50,000 each, the actual price paid was much less. This would also seem to indicate a purpose upon the part of Sawyer to keep from the stockholders and directors of the corporation the actual price paid by him for the lands.

With respect to the "Ramona track," Sawyer at the time of its purchase by him was the agent of the Edgefield Land and Improvement Company, and must be held to have purchased that tract for it and it is as much entitled to the benefit of such purchase as if it had purchased it direct, and Sawyer is only entitled to recover the actual value of what it cost him. If he suffered loss by reason of his misconduct in failing to disclose to the company what he gave in exchange for the land, and the total amount that it cost him, there is no one to blame but himself. The court seems to have adjusted this transaction upon an equitable basis, and we are disposed to defer to its findings.

"If an agent undertakes to act for himself, and at the same time for his principal, and reaps an advantage by his double-dealing, the law will take it from him, unless the principal, knowing all the facts, has allowed the agent to so change his condition that he can not be put in *statu quo*, and thus make it inequitable to rescind the contract." *Euneau v. Rieger*, 105 Mo. 675.

The conclusion reached by the trial court was well warranted by the evidence, and finding no reversible error in the record we affirm the judgment.

Gantt, P. J., and Sherwood, J., concur.