*Southard & Southard,* for plaintiff in error.

*Smith & Baker,* for defendants in error.

---

## FRAUDULENT SALE BY A PROMOTER.

[Circuit Court of Darke County.]

SECOND NATIONAL BANK v. GREENVILLE SCREW-POINT STEEL FENCE POST CO. ET AL.

Decided, November 18, 1899.

*Corporation—Sale of Property to at a Profit—The Seller a Promoter and Trustee of the Profit Derived, When—Fraud Must be Shown by Clear Evidence—Liability of the Promoter—The Remedy.*

1. One may sell his own property to an association of individuals or a corporation at any price he may see fit and the purchaser is willing to pay, without regard to the profit he may thereby derive or the fact that he is himself a stockholder, provided only that no false representations are made.

2. But where the object in view is the formation of a company for the purpose of selling to it property belonging to another, at a price largely in excess of what the owner is to receive, the one thus negotiating becomes a promoter and occupies a fiduciary relation toward the company, and is bound to disclose his relation to the property it is proposed to purchase.

3. Suppression or concealment of material facts in such a connection is a fraud on the company, and renders the promoter liable as trustee for the profits thus wrongfully made.

4. Fraud of this character must be shown by clear and conclusive evidence, and can not be based on suspicion.

5. Three courses of action are open to a corporation thus fraudulently dealt with. They may restore the promoter to his original situation, rescind the contract and recover the money wrongfully made; or they may offer to restore, and by keeping the offer good sue in equity for a rescission and recovery; or the stockholders may join to charge the guilty parties as trustees of the profits thus withheld and for an accounting.

SULLIVAN, J.; WILSON, J., and SUMMERS, J., concur.

Appeal.

The defendant, The Greenville Screw-Point Steel Fence Post Company, a corporation, was incorporated under the laws of Ohio, and organized and entered upon the business for which it was formed in June, 1895. For reasons not necessary to be stated here, the corporation in the following year, was, upon the petition of a part of the stockholders, dissolved, its affairs wound up and its debts paid in full.

The evidence set forth in the transcript of the testimony shows that W. K. Clyne, of Miami county, Ohio, on April 18, 1893, obtained letters patent for an improvement in fence posts, which consisted chiefly of a screw-point attached to the end of the post inserted in the ground.

That on November 5, 1894, he entered into a written contract with the defendant, H. D. Tilman, in which it was agreed that Tilman was to sell territory and posts, with the improvement covered by said patent, for Clyne, and to return to Clyne one-half of the proceeds of such sales. That some time in March, 1895, Tilman (whether in conjunction with Clyne or not does not appear affirmatively from the evidence) conceived the notion of associating a number of parties together as partners, for the purpose of buying this patent, to sell territory and also manufacture the post for sale. Thereupon an instrument was drawn up, which recited that the subscribers thereto were to become "co-partners" under the firm name of "The Clyne Screw-Point Post Company," for the purpose of carrying on together the business of manufacturing and selling posts and territory, with the understanding that the territory was to cost $15,000."

The contract provided that each party was to pay the amount set opposite his name signed upon this instrument. That the number of shares should be fifteen, and of $1,000 each. This agreement was not to be binding upon any subscriber unless all the shares were subscribed. Before the number of shares had been subscribed, those who had signed were notified to appear at the court house in Greenville on June 8, 1895, for the purpose of organizing or launching the partnership. By whom

such notice was given does not satisfactorily appear, but it is immaterial by whom, in view of what occurred between the parties at that meeting.

. After the parties came together, they concluded to abandon the plan of a partnership and form a corporation; thereupon the necessary steps were taken to obtain a charter, and all who had theretofore subscribed to the instrument proposing a partnership subscribed respectively the same amount for the capital stock of the corporation. The several subscribers gave notes for their stock, instead of cash, payable in one and two years. These notes up to the sum of $11,250 were made payable to Clyne, $3,750 of the stock being reserved by Clyne.

In a settlement between Tilman and Clyne, this stock subsequently became the stock of Tilman. Upon what terms it became the property of Tilman there is a conflict in the evidence of Clyne and Tilman. However, it is wholly immaterial how it became Tilman's under the present status of the case. Whatever was done at this meeting by Tilman appears to have been done with the approval at least of Clyne.

The plaintiff, after averring its corporate capacity, sets forth in its petition that the defendant, the Greenville Screw-Point Steel Fence Post Company, on the 15th day of May, 1895, was a corporation duly incorporated under the laws of Ohio and had an authorized capital stock of $25,000, divided into two hundred and fifty shares of one hundred dollars each, of which one hundred and fifty shares had been subscribed, paid up and issued by said corporation, and there were subscribed, paid up and issued, prior to the incurring by said defendant company the indebtedness to plaintiff described in its petition, the name of each subscriber, and the number of shares subscribed for, by each, as set forth.

It then avers that on the 15th of May, 1896, the said Fence Post Company, being wholly insolvent, an action was commenced in Darke county common pleas against the same by certain of the stockholders to dissolve said corporation and to appoint a receiver to take charge of its assets and effects.

And that such proceedings were thereafter had in said action that said corporation on the 15th of September, 1896, was dis-

solved, a receiver appointed who converted all the assets of said company into money, paid costs of the proceedings and applied the balance in payment upon the indebtedness of said company, and after applying said balance there still remained due and unpaid an indebtedness against said company of $1,650, of which sum there was due and owing plaintiff a balance of $941.44, for money loaned to said company, and for which said company had executed its notes to plaintiff.

The plaintiff then set forth, so far as known, the names of all other creditors of said company. Plaintiff averred that by reason of the premises the defendant stockholders named became liable to plaintiff and the other creditors of said company to an amount, equal in amount to the stock owned by each. Wherefore it prays that the creditors of said company and the amount due each might be ascertained by such method as the court should direct; determine the amount in which each of the stockholders is liable to plaintiff and other creditors of the company, and that the court order the payment of such amount by each stockholder for the purpose of paying said claims, and all other relief as in equity the circumstances of the case may require.

The cross-petition filed by the receiver in this case, and upon the averments of which arise the issues to be determined, after setting forth that the corporation had been dissolved, its affairs wound up and all its debts paid, charges that the defendants, Tilman, Armstrong, Halderman, Van Lue and Eidson, combined and confederated together for the purpose of cheating and defrauding all other parties who had become, or might become, stockholders in said corporation. That the fraud which they together had perpetrated upon their co-stockholders and members of said company consisted in having falsely represented to their associates that the improvement they were purchasing was a valuable invention, and that it could not be purchased from Clyne for less than $15,000, and that they had procured said Clyne to sell the same to the company for that sum, and falsely represented that Clyne had agreed if they could raise $10,000 and that he would remain interested with them to the extent of $5,000 and that thereafter he, Clyne, would dispose of this amount to such persons as the other stock-

holders might select. That each of the confederates named sub-
scribed $1,000 to the capital stock of the corporation. That
these subscriptions by such confederates were a mere pretense
upon their part; that they neither paid cash nor gave their notes
as the others had done. There are other charges of fraud and
fraudulent representations not necessary to mention here, as
the bill does not disclose that any proof was offered to sustain
them. Believing such representations, and upon the strength
of them, the other parties in good faith became stockholders
in the corporation, and complied with all the obligations upon
their part respecting the same.

The court below found from the evidence that neither of the
five parties charged with the fraud had paid their subscription
and entered up a judgment against them respectively for the
amount of the same, with interest on the one-half thereof from
June 8, 1896, and the remaining one-half from June 8, 1897,
and found from the evidence that the defendants, Tilman and
Halderman, had secured to themselves a secret profit in the
sum of $6,050 by representing to the company that the patent
could not be bought for less than $15,000, when in fact, out
of the amount raised from the notes given, they paid Clyne
$3,000 and no more: that whilst these confederates were rep-
resenting to the other parties, who became stockholders, that
said patent could not be purchased for less than $15,000, they
had in fact an agreement with Clyne to purchase it for $3,000;
that upon such representations they secured to themselves a
profit of $6,050 that belonged to the corporation; and therefore
a judgment for that amount was entered up against Tilman
and Halderman, in favor of the receiver, together with interest
on the one-half thereof from June 8, 1896, and on the remaining
one-half from June 8, 1897. From this judgment the defend-
ant, Halderman, took an appeal to this court.

The case was heard upon the pleadings, transcript of the
testimony taken in the court below, and some additional testi-
mony taken at the trial here.

The first question to be determined from the evidence is the
relation that the defendants, Tilman and Halderman, sustained
to the company or to their associates, each of them being a

member of the corporation. If Tilman had been the owner of the patent, then he would have been entitled to any profit there might have been upon the sale of it to the company, although a member of the company. If he purchased the patent in his own name and then sold it to the corporation, although it was organized by him, he would not be a trustee of the corporation. See *Milwaukee Cold Storage Co.* v. *Dexter,* 74 N. W. Rep., 976 (99 Wis., 214), fifth syllabus:

"Any man or number of men who are the owners of any kind of property, real or personal, may form a partnership or association with others, and sell that property to the association at any price which may be agreed upon between them, no matter what it may have originally cost, provided there be no fraudulent representations made by the vendors to their associates. They are not bound to disclose the profit they may realize by the transaction." *Densmore Oil Co.* v. *Densmore,* 64 Pa. St., 49.

See *Milwaukee Cold Storage Co.* v. *Dexter,* 74 N. W. Rep., 976 (99 Wis., 214, 229).

If Tilman was simply the agent of Clyne to sell the Patent and Tilman's compensation was simply a share of the proceeds of such sale, then Tilman could not be held for any profits he may have made, but would be liable only for any damages accruing to the corporation from any false representations made by him, not authorized by Clyne.

However, it is not necessary in the present status of the case to determine whether Tilman acted simply as the agent of Clyne or whether Clyne and he were acting together in the organization of the corporation and the sale of the patent to it, as the evidence, we think, clearly shows that Tilman's representation to those he was seeking to induce to become stockholders was that the patent was held by Clyne at $15,000, and that he could not purchase it for the company from Clyne at a less figure, holding out to such parties all the time that the corporation, of which he was a stockholder and which he was active in promoting, must pay that figure to Clyne before they could get the patent, concealing all the while from his associates the arrangement he had made with Clyne, as stated in his own testimony. His entire conduct was such as to invest his associates with an honest belief that the entire sum was to go to

Clyne, and that the reward, or rather remuneration he expected for his efforts in accomplishing the organization of the company and getting it to operating, was that which would come to him on his stock, just like any other stockholder. We think his own conduct contradicts the claim he now makes, that he stated to all the parties, except two, that he was simply endeavoring to sell the patent as Clyne's agent.

We think the evidence shows that he was inspired solely to become a member of the company and thereby induce his associates to believe that he was interested in the enterprise, with no other expectation of profit to himself except such as would accrue in common to all, for no other purpose except to enable him to make a profit upon a sale of the patent to the company.

We have very high authority defining who and what are promoters. In *Yale Gas Stove Co.* v. *Wilcox,* 29 Atl. Rep., 303, 307 (64 Conn. 101), reading from the opinion of the court, in which the court says "who and what are promoters, so called, of corporations, and what their relations are to the corporations which they help to form, has been more frequently judicially considered and determined by the English courts than by those of this country. A 'promoter' has been defined to be a person who organizes a corporation. It is said to be, not a legal, but a business term, usually summing up in a single word a number of business operations familiar to the commercial world, by which a company is generally brought into existence.  *  *  * That such persons occupy a fiduciary relation toward the company or corporation whose organization they seek to promote, is well settled by the decisions of both countries."

The original instrument, drawn with a view to the formation of a partnership, was inspired by him, and he was active throughout, and therefore a promoter. In his relation to the company, it was his duty to act for the best interests of it like any other stockholder, and therefore he could not withhold any secret profit made by him.

Tilman's first object was the formation of some kind of a company with a view to the sale of the patent. The kind of company that could best do this, and thus accomplish the end he had in view, may not have been in the beginning very clear

to his mind, but he ultimately succeeded in forming one and reached the result he was after, *i. e.*, sale of the patent. He became a member himself, and certainly concealed from every one that the effort he was making was for an expected profit from such sale. He was then a promoter, and sustained a fiduciary relation to the company, and as the court say in the case last above cited, page 122 of the opinion, "he must make full disclosure to the company of his relations to the property, that is the subject of his deal. Suppression, concealment, or misrepresentation of material fact is fraud; upon proof of which rescission of contract or repayment of secret profits will be compelled."

Though he may have been acting as agent of Clyne, yet the relation he sustained to the company was that of promoter and as such it was his duty to have disclosed the true arrangement he had with Clyne. *Yale Gas Stove Co.* v. *Wilcox,* 29 Atl. Rep., 303 (64 Conn. 101); *Exter* v. *Sawyer,* 47 S. W. Rep., 951 (146 Mo., 302), 2d Syllabus; *Franey* v. *Warner,* 71 N. W. Rep., 81 (96 Wis., 222).

Upon the discovery of the wrong perpetrated by Tilman upon his associates, three remedies were open to them to redress such wrong: (1) They could, by restoring Tilman to his original situation, have rescinded the contract and recovered their money; (2) or they might have offered to restore, and by keeping such offer good, sued in equity for a rescission of the contract and a recovery of their money; (3) or, as in this case, without restoring or offering to restore, all stockholders who were in a similar situation could join in a suit in equity to charge the guilty parties as trustees of the profits fraudulently retained by each, and an accounting.

This being an action to require an accounting for the secret profits, made by Tilman between the amount actually paid Clyne and that which was obtained from the company, what part, if any, does the evidence show was received by Halderman? The bill does not show by any direct or positive evidence that he received any part of it; neither is it shown by any of the circumstances. At best the evidence merely creates a suspicion that Halderman participated in such profit.

There are many things that were done by Halderman that would seem to justify such suspicion. First, the active part he took in securing others to go into the enterprise, and his knowledge that some were securing advantage over others. Second, his association with Tilman. And, lastly, his conduct and contradictory statements made with reference to the notes he gave after trouble arose. However Tilman swears that Halderman never received a dollar of the profit, and not only that, but he swears that Halderman never knew but what it was true that $15,000 was to be paid to Clyne. Halderman swears to the same. True it might be claimed that they were not entitled to credit, and that these sworn statements in this respect should not be received. But they are corroborated by the fact that none of the notes given were made payable to Halderman; not a particle of evidence that any were endorsed over to him, or that he ever presented any of them for payment. On the other hand, the evidence shows that all that were sold were negotiated by Tilman and Clyne, and the proceeds of such sales were divided between Tilman and Clyne, Tilman receiving the smaller amount when the division was made.

Yet it is urged that with all this, Tilman could have divided the money he received with Halderman. Fraud must be shown by clear and conclusive evidence, and if the court should so find, it would have to do so from suspicion alone, and not from the evidence. It is, however, claimed that though Halderman may not have received any such profit, yet he, being a confederate with Tilman, and aiding Tilman in the perpetration of the wrong, that therefore he is equally liable with Tilman. This would be true if the evidence showed that Halderman knew that the representations made by Tilman to secure such profit were false and fraudulent. There is no evidence showing that he did know. He never saw Clyne; never knew him; never had any correspondence with him. He and Tilman both swear that Halderman never knew anything of the arrangement between Tilman and Clyne. Halderman evidently believed that the improvement was a good thing, and there is no evidence but what the improvement is fully worth every cent paid for it. There is no such clear and conclusive evidence as the law requires

to justify the conclusion that he did know. If he did not, then he could not be held liable for any part of the profit received by Tilman.

What Halderman should have done when the wrong of Tilman was discovered, was to have paid the amount of his subscription to the treasurer of the company instead of to Tilman; we think the evidence shows he paid it afterward.

Judgment therefore for the amount of his subscription will be entered up against him in favor of the receiver, with six per cent. interest on the one-half from June 8, 1896, and on the remaining one-half from June 8, 1897, and to be paid within ten days from the date of this decree, or execution will issue therefor; and judgment against Tilman for $6,050 with interest at six per cent. on the one-half thereof from June 8, 1896, and on the remaining one-half from June 8, 1897, less the amount of notes returned by him with interest thereon, as provided in said notes. Several of said notes are endorsed by Clyne and we presume they are good. In any event Tilman should not be charged with anything not received by him. Judgment against Tilman to be paid in ten days from date of decree, or execution to issue therefor.

The costs of appeal and those of this court will be taxed up to Halderman and Tilman in the proportion as the judgment against them bear to each other. This case will be remanded to the court of common pleas to carry these judgments into execution. In view of the fact that there will be other services to be performed by counsel for the receiver in that court that can not now be estimated, the amount of fees for such counsel may be fixed by that court.

Entry may be drawn setting forth the above finding and judgments.

*Ellist & Chenowith* and *John C. Clark,* for plaintiff in error.

*Anderson & Bowman, Allread & Teegarden* and *Williams & Krickenberger,* for defendant in error.