AUGUST E. BROOKER, Appellant, v. WILLIAM H. THOMPSON TRUST COMPANY et al.

Division One, January 3, 1914.

1. **CORPORATIONS: Directors: Interested Personally in Transactions with Their Corporation.** Directors of corporations have no right to use their official positions for their own benefit, or for the benefit of anyone except the corporation itself. They have no authority to represent the corporation in any transaction in which they are personally interested in obtaining an advantage at the expense of the company.

2. ————: ————: ————: **Fiduciary Relation.** Where it appears that directors of a corporation have attempted to bind the company to a contract made with themselves personally, or to represent it in any transaction with third persons in which they have a private interest at stake, the law does not stop to inquire whether the contract or transaction was fair or unfair. It stops the inquiry when the relation is disclosed, and sets aside the transaction or refuses to enforce it, without undertaking to deal with the question of abstract justice in the particular case.

3. ————: **Promoter.** A promoter is a person who brings about the incorporation and organization of a corporation. He brings together the persons who become interested in the enterprise,

aids in procuring subscriptions, and sets in motion the machinery which leads to the formation of the corporation itself, bringing himself finally into a fiduciary relation thereto analogous to that of trustee and *cestui que trust*.

4. ————: ————: His Relation to Corporation. There is no magic in the word "promoter" which solves the relation of one who takes upon himself the burden of forming a corporation, either to the associates who may enlist with him in the prosecution of the work, or to the corporation in which all their interests will be combined upon its successful completion. This relation will depend upon the nature of the work and the contractual relations, either express or implied, which he assumes with respect to others interested in the common object.

5. ————: ————: Selling Property to Corporation. Promoters who project and form a corporation by soliciting and procuring others to subscribe for and take shares of stock, for the purpose of selling or turning over to the company property which they own, or have a right to acquire by executory contract, occupy a double position. On the one hand they represent their own interest in respect to the disposition of the property; on the other, they represent the proposed corporation.

6. ————: Directors: Purchasing Property for Corporation: Bonus. Where the directors of a corporation agreed to purchase property from the promoter, also a director, for $500,000 more than he paid for it, that sum to be divided as a bonus among the directors, they acquired through the purchase no right to the $500,000, and their duty to refund that amount to the corporation must be considered solely with reference to their rights independent of the board's action. And this is so although the capital stock was paid up and the bonus was a part of the surplus.

7. ————: Profit to Promoters: Disclosure: Notice. A promoter holding valuable options, an underwriting syndicate and a bank agreed together to form a corporation with a paid up capital of $1,500,000 and a surplus of $750,000, the surplus to be provided by selling the 15,000 shares, par value $100, at $150 a share. The promoter was to put in his options, and the underwriters were to take $300,000 of the stock and deposit that amount with the bank, which should finance the operation. Nine thousand shares of the stock were to be sold to the public by the bank through brokers. It was also provided that $500,000, to be taken from the surplus, should be added to the cost of the plants covered by the options, and given to the promoter, to be distributed as a bonus between the promoter and the underwriters. The corporation was formed, the stockholders voted to purchase the plants at a sum which included

the $500,000 bonus, and the directors authorized the officers to complete the transaction, which they accordingly did. All of the stockholders had knowledge of the bonus and were interested in it, except a brokerage company which subscribed for the stock to resell it. An officer of the brokerage company signed the subscription and saw that it purported to be a purchase from the promoter rather than an original subscription, and saw also that it contained a reference to the underwriters' agreement, which agreement was not, however, he says, attached although stated so to be. *Held*, that a purchaser of shares from the brokerage company cannot, although his shares have depreciated greatly in value, recover anything from the underwriters and the promoter, on behalf of the corporation, on account of the bonus. The duty of the promoter was performed when he made full disclosure of his profits and received the consent of all who were interested as a part of his original plan and furnished any of the money; and the brokerage company had notice, in view of the rule that when a written contract refers to another document the latter is made a part of the contract. [WOODSON, P. J., concurring in result.]

Appeal from St. Louis City Circuit Court.—*Hon. William M. Kinsey,* Judge.

AFFIRMED.

*Eugene H. Angert* and *C. W. Wilson* for appellant.

(1) A promoter of a corporation occupies a fiduciary relation to the corporation which he promotes and to its stockholders, and like all fiduciaries, such as agents or trustees, cannot make any personal profit or gain out of any transactions for or with his principals, either by way of profit in dealings with the corporation or as remuneration for his services in promoting the corporation. Cook on Corp., sec. 651; Exter v. Sawyer, 146 Mo. 302; Land Co. v. Case, 104 Mo. 572; Land Co. v. Webster, 75 Mo. App. 457; Phosphate Co. v. Erlanger, L. R. 3 App. Cas. 1208; Gluckstein v. Barnes [1900], App. Cas. 240; Yeiser v. Paper Co., 107 Fed. 341; Chandler v. Bacon, 30 Fed. 538; Hayward v. Leeson, 176 Mass. 310; Fruit Co. v. Buck, 52

N. J. Eq. 219; Pietch v. Kronkel, 116 Wis. 344; Mining Co. v. Spooner, 74 Wis. 307; Stove Co. v. Wilcox, 64 Conn. 10; Carbonating Co. v. Bank, 103 Wis. 26; Arnold v. Searing, 67 Atl. 852; Brewster v. Hatch, 10 Abb. N. C. 400, 122 N. Y. 350; Copper Co. v. Bigelow, 188 Mass. 315, 203 Mass. 259; Torrey v. Cement Co., 158 Mich. 348; Mason v. Carrothers, 105 Me. 405. (2) The directors of a corporation stand in a fiduciary relation to the corporation and to its stockholders, and are likewise precluded from making any personal profit or gain at the expense of the corporation. 2 Cook on Corp., secs. 650, 652; 3 Clark & Marsh. on Corps., sec. 758; Bent v. Priest, 86 Mo. 482; Ward v. Davidson, 89 Mo. 448; Hannerty v. Theater Co., 109 Mo. 304; Hill v. Mining Co., 119 Mo. 9, 22; Hill v. Mining Co., 124 Mo. 153. (3) On the promoter rests the affirmative duty to make full disclosure of his profits and obtain the stockholders' consent with full knowledge of the facts, and in the absence of such disclosure and consent the profit belongs to the corporation and can be recovered by it. Colton Co. v. Richter, 26 Misc. (N. Y.) 26; Erlanger v. Phosphate Co., L. R. 3 App. Cas. 1208; Gluckstein v. Barnes [1900], App. Cas. 240; Exter v. Sawyer, 146 Mo. 323; Land Co. v. Flash, 97 Cal. 612; 2 Cook on Corps., secs. 650, 652; 3 Clark & Marsh. on Corps., sec. 758; Thompson on Corps., secs. 4024, 4025; 1 Morawetz on Corps., secs. 517, 518; Land Co. v. Webster, 75 Mo. App. 457; Dickerman v. Trust Co., 176 U. S. 181; Fruit Co. v. Buck, 52 N. J. Eq. 219; Getty v. Devlin, 54 N. Y. 403, 70 N. Y. 504; Iron Co. v. Bird, 33 Chan. Div. 85. (4) Where a promoter wishes to sell property in which he is interested to the corporation, it is his duty to provide the corporation with an independent board of directors that will be able to form an independent and impartial judgment as to the wisdom of the purchase and the price to be paid, and where, as in the case at bar, the directory was composed of the promoters and their associates, all

of whom were directly interested in the proposed purchase as sharers in the profit to be made at the expense of the corporation, this obligation is not met and the profit must be returned to the corporation. Phosphate Co. v. Erlanger, L. R. 3 App. Cas. 1208; Gluckstein v. Barnes (1900), App. Cas. 256; Fruit Co. v. Buck, 52 N. J. Eq. 219; See v. Heppenheiner, 61 Atl. 843; and cases under Point 1. (5) The parties to whom the promoter must make full disclosure of his profits and whose consent he must obtain are those who become interested as stockholders of the corporation as a part of the promoters' plan, and who furnish any part of the funds used to enable the promoter to carry out his scheme and to launch the corporation. The promoter's profit is not made valid by the consent of the subscribers or stockholders so long as there are others interested in the corporation or others who are to become interested in it as stockholders, in furtherance of the original plan of the promoters. So where all the stock of the corporation is subscribed in the articles of association by the promoters and his associates or nominees, but upon the understanding and with the intention that a part of said stock is to be paid for and issued to third parties, the third parties who pay for and to whom such stock is issued are the real bona-fide stockholders to whom disclosure must be made, and whose consent must be obtained to render the promoters' profit valid. Hayward v. Leeson, 176 Mass. 310; Pietsch v. Millbrath, 123 Wis. 647; Trust Co. v. Mackenzie, 62 Chan. Div. 870; Mining Co. v. Spooner, 74 Wis. 307; Arnold v. Searing, 67 Atl. 852, 74 Atl. 762; Brewster v. Hatch, 10 Abb. N. C. 400, 122 N. Y. 350; Phosphate Co. v. Erlanger, L. R. 3 App. Cas. 1218; Gluckstein v. Barnes [1900], App. Cas. 257; Copper Co. v. Bigelow, 188 Mass. 315, 203 Mass. 159; Copper Co. v. Lewisohn, 210 U. S. 206; Torrey v. Cement Co., 158 Mich. 348; Mason v. Carrothers, 105

Me. 405; Wills v. Coal Co., 96 Pac. 528; Oil Co. v. Morris, 108 Va. 288. (6) Under the facts of this case the Edwards Brokerage Company were parties who it was intended by the promoters should become interested, and who did become interested as stockholders of the corporation as a part of the plan of organization, and who occupied the position of persons to whom disclosure of the profit must be made within the rule established above. The promoters cannot retain any profit made by them unless they obtained the consent of the Edwards Brokerage Company. (7) There is no merit in the contention that because Richards subscribed in the articles of association for the stock which had been taken by and was afterwards paid for and issued to the Edwards Brokerage Company that the consent of Richards to the profit to himself rendered the consent of the Brokerage Company unnecessary. A corporation is not prevented in any state of facts from ignoring the dummy subscriber for stock and recognizing the bona-fide owner of such stock, and especially is this true in cases where the promoter makes the record of the subscribers for the purpose of enabling himself to make escape with his profit. Pittsburgh v. Spooner, 74 Wis. 307; Arnold v. Searing, 67 Atl. 852; Terwillinger v. Tel. Co., 59 Ill. 249; Hotel Co. v. Wright, 73 Mo. App. 240; Banking Co. v. Adams, 72 S. W. 1125; Bank v. Talbot, 131 Cal. 45; Bates v. Tel. Co., 134 Ill. 536; Brie v. Wilcox, 22 N. Y. 551; Shickle v. Watts, 94 Mo. 419. (8) When the promoter is shown to have made a personal profit out of the organization of the corporation, a prima-facie case is made against him and he must repay it to the corporation unless he shows as matter of defense that he made full and complete disclosure of the amount of his profit to all parties interested in the corporation and obtained their consent thereto. The burden of proof is upon the promoters, as upon all trustees, to show that he made the disclosure and obtained the

consent of his *cestui que trust.* Evans v. Evans, 196 Mo. 18; Newman v. Newman, 152 Mo. 413; State ex rel. v. Jones, 131 Mo. 210; Gavin v. Williams, 44 Mo. 465; Colton Co. v. Richter, 26 Misc. (N. Y.) 26; In re Box Co., 17 Chan. Div. 476. (9) No disclosure of the fact that the promoters and their associates were making a profit of $500,000 or any amount was made to the Edwards Brokerage Company, and its consent to the making of such profit was not obtained. The consent of the Edwards Brokerage Company could only be obtained after imparting to it actual knowledge of the facts and it is uncontroverted that no actual knowledge was brought home to the Edwards Brokerage Company. Hinkley v. Pipe Line Co., 107 N. W. 632; Yeiser v. Paper Co., 107 Fed. 301; Whitechurch v. Whitechurch [1902], App. Cas. 117; Cook on Corps., sec. 717; Hardware Co. v. Grocer Co., 64 Mo. App. 681; The Famous Co. v. Eagle Co., 51 Mo. App. 71; Rogers v. Brice, 105 Ga. 432; Brick v. Dyer, 187 Pa. St. 470; Tyler v. Anglo-Am. Ass'n, 32 S. W. (Ky.) 602; Somerset v. Adams, 72 S. W. 1125; Cook on Corps., sec. 23; 23 Am. & Eng. Ency. Law, 786; Railroad v. Clark, 22 Hun, 359; Schollmeyer v. Patterson, 168 Pa. St. 30; Shickle v. Watts, 94 Mo. 419. (10) The Edwards Brokerage Company is not chargeable with constructive notice of the promoter's profit by reason of their signature to the stock subscription paper. The duty of the promoters is to impart to the stockholders all of the facts, and merely putting the stockholders upon inquiry does not satisfy that duty. Bound v. Railroad, 50 Fed. 853; Jamison v. Glasscock, 29 Mo. 196; Land Co. v. Case, 101 Mo. 579; Richards v. Pitts, 124 Mo. 615; Garvin v. Williams, 44 Mo. 465; Bent v. Priest, 10 Mo. App. 557; Newman v. Newman, 152 Mo. 413; Pomeroy v. Benton, 57 Mo. 548; State ex rel. v. Jones, 131 Mo. 210; In re Box Co., 17 Chan. Div. 476; Colton Co. v. Richter, 26 Misc. (N. Y.) 26; Gluckstein v. Barnes (1900), App. Cas. 255; In re Olympia (1898),

2 Chan. Div. 155; Chaffee v. Berkley, 118 N. W. 269; Arnold v. Searing, 78 Atl. 768; Wills v. Coal Co., 96 Pac. 535; Combs v. Scott, 12 Allen, 498; Coal Co. v. Sherman, 20 Md. 117; Land Co. v. Lewis, 53 Atl. (Me.) 533; State ex rel. v. Findley, 101 Mo. 377; Gray v. Gillilian, 63 Mo. 33; Newton v. Rebeneck, 90 Mo. App. 673; Pitts v. Mercantile Co., 75 Mo. App. 231; Clark & Marsh. on Corp., p. 1706; Green v. Hadenberg, 159 Ill. 489; Real Estate Co. v. Nash, 34 S. E. (Va.) 182; Coal Co. v. Sherman, 30 Barb. 575; Real Estate Co. v. Nash, 41 S. E. (Va.) 182; Greenwood v. Wheel Co. (1900), 1 Chan. Div. 421. (11) The issue of $500,000 of the stock of the company to the promoters and their associate directors as a bonus was in violation of the Constitution and laws of the State and was illegal and void. Furthermore, even if the Edwards Co. could be said to have assented to that transaction, such assent would not be binding upon the corporation, since the scheme contemplated that 9000 shares of the stock should be sold to the public, which was done. Under such state of facts, any innocent member of the public who purchased the stock, is entitled to bring this action and require the promoters to repay the $500,000. Constitution, art. 12, sec. 8; R. S. 1909, sec. 2981; Morrow v. Steel Co., 87 Tenn. 262; Williams v. Evans, 87 Ala. 725; Garrett v. Mining Co., 113 Mo. 338; In re Weymouth Co., 1 Chan. Div. 80; Welton v. Saffery, L. R. 1 App. Cas. 304; Cook on Corp. (3 Ed.), sec. 717; 3 Clark & Marsh. on Corps., p. 2151; Hardwood Co. v. Grocer Co., 64 Mo. App. 681; The Famous Co. v. Iron Works Co., 51 Mo. App. 71; Muehring v. Weber, 84 Pac. 220; Short v. Van Dyke, 50 Minn. 286; Noyes v. Butler, 108 N. W. 839; Hopkins v. Rodgers, 11 Tenn. 457; Harvey v. Radkey, 1 White & Wilson Civ. Cas. (Tex.) 277; Dickey v. Henaire, 15 Ore. 351. (12) The plaintiff can maintain this action in behalf of the corporation, since the corporation after demand upon its officers and direc-

tors, failed to institute the suit and in such case any stockholder may sue in its name. No demand was necessary, where as here the corporation was under the control of the parties charged with profiting at the corporation's expense, since by reason of their relation to the transaction complained of they were not in a position to institute and carry on this litigation. Exter v. Sawyer, 146 Mo. 302; Hannerty v. Theater Co., 109 Mo. 297; Ward v. Davidson, 89 Mo. 446; Hingston v. Montgomery, 121 Mo. App. 458; Slattery v. Transportation Co., 91 Mo. 217; Loomis v. Railroad, 165 Mo. 469. (13) All of the defendants are jointly and severally liable for the profit of $500,000 received by the promoters and judgment shall be entered against each of them for that amount with interest from Feb. 18, 1901. Davis v. Hoffman, 167 Mo. 573; Bent v. Priest, 10 Mo. App. 566; 3 Pomeroy, Eq. Jur. (2 Ed.), sec. 1081; Clark & Marsh. on Corps., p. 327; Phosphate Co. v. Erlanger, 5 Chan. Div. 73; Gluckstein v. Barnes (1900), App. Cas. 256; Land Co. v. Robinson, 97 Pac. 10, 18 L. R. A. (N. S.) 1106; Bagnell v. Carlton, 6 Chan. Div. 370; Chandler v. Bacon, 30 Fed. 538; Park Co. v. Roberts, 92 Wis. 345; Emery v. Parrott, 107 Mass. 103; Ryan v. Leavenworth, 21 Kan. 365.

*George H. Williams, E. W. Banister* and *Boyle & Priest* for respondents.

(1) Richards was the original owner of the shares now held by plaintiff. The court's finding of facts. Sec. 1123, R. S. 1909; Bank v. Rockefeller, 195 Mo. 15; Joy v. Manion, 28 Mo. App. 55; Schaeffer v. Ins. Co., 46 Mo. 248; Chouteau Springs Co. v. Harris, 20 Mo. 382; Knapp v. Knapp, 127 Mo. 53; Kimball v. Davis, 52 Mo. App. 194. (2) The Guaranty Trust Company consented to the purchase complained of with knowledge of the facts and is therefore bound. The court's

finding upon the law and the facts. Copper Co. v. Lewisohn, 210 U. S. 206; Alger, Law of Promoters, sec. 39; 1 Morawetz Priv. Corp., sec. 90; Cook on Corporations, sec. 40; Pitts v. Steele Mer. Co., 75 Mo. App. 221; Richardson v. Graham, 45 W. Va. 194; Higgens v. Lausingh, 154 Ill. 301; Parsons v. Hayes, 14 Alb. N. Cas. 419; Barr v. Railroad, 121 N. Y. 263; Foster v. Seymour, 23 Fed. 65; In re Ambrose & Co., 14 Ch. 390; Brown v. Railroad, 53 Fed. 889. (3) A. G. Edwards & Sons Brokerage Company, through whom plaintiff claims, purchased its stock from Richards, with knowledge of the facts. St. Louis v. Gas Light Co., 155 Mo. 17; Little v. Trust Co., 197 Mo. 281; 1 Beach on Contracts, p. 868; Adams v. Hill, 16 Me. 215; Rothschild v. Frendorf, 21 Mo. App. 318; Robinson v. Jarvis, 25 Mo. App. 421; Gwin v. Waggoner, 98 Mo. 315; Campbell v. VanHouten, 44 Mo. App. 231; Porter v. Woods, 138 Mo. 539; Nicol v. Young, 68 Mo. App. 448; James v. Clough, 25 Mo. App. 154; Penn v. Brashear, 65 Mo. App. 27; Morgan v. Porter, 103 Mo. 140. The court's finding of fact and law. (4) Plaintiff has no claim against anyone. Copper Co. v. Lewisohn, 210 U. S. 206.

BROWN, C.—This is a suit by plaintiff, a stockholder of the Title Guaranty Company, by

**Corporations.** which that company is impleaded with the parties to a contract which they called an underwriting agreement for financing the organization and capitalization of the corporation. Its object is to secure the restoration to the corporation for the benefit of its stockholders of the sum of $500,000, paid them from the capital of the corporation under the provisions of the contract already referred to, which is as follows:

"This agreement, made this twenty-first day of January, 1901, by and between H. C. Pierce, J. C. Van Blarcom, W. H. Thompson, August Gehner, A. A. B. Woerheide, Tho. H. McKittrick, Andrew Sproule,

L. D. Dozier, Jas. W. Bell, S. M. Dodd, E. C. Simmons, Thomas H. West, Festus J. Wade, Breckenridge Jones, Lorenzo E. Anderson, Murray Carleton, composing an underwriting syndicate, parties of the first part, and Eben Richards, party of the second part and the National Bank of Commerce in St. Louis, party of the third part, witnesseth:

"1.   That the party of the second part is now the owner of options upon the title plants of the following persons, to-wit:   August Gehner & Co., St. Louis Trust Co., Union Trust Co. of St. Louis, Lincoln Trust Co., Joseph Wachtel, Albert Wenzlick, Babcock & O'Connor, August Ahrens, D. Ind. Neudorf, M. B. O'Reilly, Lewis & Hall, which options have been deposited with the party of the third part for the purpose of this agreement.   And that the general object of this agreement is to form a corporation to purchase, own and operate the above title plants as one plant.

"2.   That the parties of the first and second parts hereto shall, and they hereby agree to form a corporation under the laws of the State of Missouri, relating to trust companies, and be called Title Guaranty Trust Company, with a capital stock of one million five hundred thousand dollars, full paid and with a surplus of seven hundred and fifty thousand dollars, full paid so that the book value of the stock of said corporation shall be one hundred and fifty dollars per share.   The parties of the first part hereby subscribe to the capital stock of said corporation to be formed, at the price of one hundred and fifty dollars per share, the amount set opposite the name of each respectively, to-wit:

| NAME. | AMOUNT. |
| --- | --- |
| H. C. Pierce | $139,200 |
| J. C. Van Blarcom | 10,050 |
| W. H. Thompson | 10,050 |
| August Gehner | 10,050 |
| A. A. B. Woerheide | 10,050 |
| Thos. H. McKittrick | 10,050 |

Andrew Sproule .................... 10,050
H. C. Pierce ...................... 10,050
L. D. Dozier ...................... 10,050
Jas. W. Bell ..................... 10,050
S. M. Dodd ....................... 10,050
E. C. Simmons .................... 10,050
Thos. H. West .................... 10,050
Festus J. Wade ................... 10,050
Breckenridge Jones ............... 10,050
Lorenzo E. Anderson .............. 10,050
Murray Carleton .................. 10,050

"And they, the parties of the first part, each agree to pay said sum so subscribed by them forthwith into the National Bank of Commerce in St. Louis, party of the third part, and to leave said sums on deposit with said third party, and to leave the stock so subscribed for by them with said party of the third part as collateral security of margin upon which the party of the second part may borrow from the party of the third part the amounts hereinafter set forth.

"The party of the second part agrees to subscribe for, or cause to be subscribed for, all the balance of the stock of said corporation at the price of one hundred and fifty dollars per share.

"3.    The party of the third part agrees to set aside and lend to the party of the second part for the purposes of this agreement only, upon the security of said options, subscriptions and stock of said corporation to be formed, the sum of one million nine hundred and fifty thousand dollars, which, added to the three hundred thousand dollars subscribed and paid in by the parties of the first part, will make one million five hundred thousand dollars of capital stock and seven hundred and fifty thousand dollars of surplus of said corporation.  And the party of the third part agrees to charge interest at the rate of five per centum per annum on so much of said sum of one million nine hundred and fifty thousand dollars as is actually paid out by it and used for the purposes

of this agreement until the same is returned and repaid to it, and to lend this amount so used to the party of the second part for the period of on or before six months.

"3½. That the total of one million two hundred and fifty thousand dollars shall be reserved as a liberal estimated amount to cover the costs of the several title plants and all costs and expenses of organization, including moving, furniture, fixtures, arranging books and papers, completing indexes, incorporating fees, attorneys' fees, stamp taxes, interest to party of the third part, brokers' fees, etc.; and that any surplus after the organization is complete which shall remain from said estimated amount of one million two hundred and fifty thousand dollars after paying the cost of the several title plants and the expenses of organization above enumerated shall be placed to undivided profits of the corporation.

"4. It is agreed that the Title Guaranty Trust Company shall begin business with a clear title to all the title plants above enumerated and with at least five hundred thousand dollars cash working capital.

"It is estimated, understood and agreed that the total cost of all the title plants above enumerated will not exceed one million one hundred and sixty-seven thousand five hundred dollars.

"That five hundred thousand dollars shall be added to the cost of the plants and expenses of organization as a bonus or profit to the party of the second part for his services in procuring the consolidation.

"So that the capital and surplus shall be expended as follows:

| | |
|---|---|
| Estimated cost of title plants | $1,167,500.00 |
| Reserve for expenses of organization | 82,500.00 |
| Bonus or profit to parties thereto | 500,000.00 |
| Cash working capital | 500,000.00 |
| Total | $2,250,000.00 |

"Bills of sale shall be procured for the respective title plants and when all are deposited with the party of the third part it shall pay to the respective grantors the consideration therefor. The plants shall be then conveyed to the Title Guaranty Trust Company by the party of the second part for the consideration of one million seven hundred and fifty thousand dollars to be paid to the party of the second part in the manner hereinafter provided, but of this sum five hundred thousand dollars shall be at once repaid to the party of the third part and credited to the party of the second part on the loan set out in paragraph 3 of this contract.

"6. All of the stock of said Title Guaranty Trust Company shall be deposited with party of the third part at the time of the organization of said corporation, as security for the money advanced by it, and 9000 shares of said stock shall be sold by the party of the third part through a broker or brokers appointed by it at a price of not less than one hundred and fifty dollars per share in cash, and this stock as sold shall be delivered to the purchasers and the proceeds of such sale shall be paid to the party of the third part to be applied upon its advances.

"It is understood that if the market should afford the opportunity and the party of the third part should sell any or all of said 9000 shares of stock for more than one hundred and fifty dollars per share, the surplus over and above said one hundred and fifty dollars per share shall be divided between the parties of the first and second part in the proportion of two-fifths to the parties of the first part and three-fifths to the party of the second part.

"When the 9000 shares of stock are sold then two thousand shares of the book value of three hundred thousand dollars shall be issued to the parties of the first part in the proportion of their respective subscriptions as set out in paragraph 2 hereof, which

is the stock subscribed for and paid for by the three hundred thousand dollars advanced according to terms of paragraph 2 hereof.

"There shall also be issued 3333 shares of stock of the book value of five hundred thousand dollars to the party of the second part, which is the bonus or profit added to the cost of the respective title plants for the services of the party of the second part and his associates. Of these 3333 shares the party of the second part agrees to give and transfer to the parties of the first part, to be divided in proportion of their respective subscriptions, 1333 shares of the book value of two hundred thousand dollars as compensation to them for the advancement and use of the three hundred thousand dollars subscribed by them to the capital stock of said corporation.

"The party of the second part agrees to subscribe for 667 shares of said capital stock at a price of one hundred and fifty dollars per share, or a total of one hundred thousand dollars, and to pay for the same in cash when the 9000 shares are sold by the party of the third part and when the balance of the stock is released and issued by the party of the third part as in this paragraph 6 above mentioned. So that the stock of said corporation shall be issued as follows:

Subscribed and paid for in cash by the parties of the
    first part, 2000 shares ............................$ 300,000
Issued to the parties of the first part as their share of
    the deal, 1333 shares .............................. 200,000
Issued to the party of the second part as his share of the
    profits of the deal, 2000 shares ...................... 300,000
Subscribed and paid in cash by the party of the second
    part, 667 shares ................................... 100,000
Sold to the public at one hundred and fifty dollars per
    share 9000 shares ................................ 1,350,000
                                             ———————
    Total 15,000 shares .............................$2,250,000

"7. The financial transactions with the party of the third part will be as follows:

Brooker v. Trust Co.

```
Paid in by underwriting syndicate .....................$  300,000
Set aside by bank to form corporation .................  1,950,000
                                                        _____
                                                        $2,250,000
```

"Return to bank at once:

```
Cash working capital ..................................$  500,000
Cash to pay for stock issued to second party...........   500,000
Reserve for expenses or undivided profits .............    82,500
                                                        _____
                                                        $1,082,500
Amount of actual loan needed ..........................$  867,500
                                                        _____
                                                        $1,950,000
```

"8. It is understood and agreed that this contract shall not be binding between the several parties hereto until subscriptions to the full amount of three hundred thousand dollars are made according to the terms of paragraph 2 hereof and such subscriptions evidenced by the signatures of the several subscribers to this instrument.

"In witness whereof, the several parties hereto have caused these presents to be executed in due form the day and year first above written.

"H. C. Pierce          Jas. W. Bell
"J. C. Van Blarcom     S. M. Dodd
"W. H. Thompson        E. C. Simmons
"August Gehner         Thos. H. West
"A. A. B. Woerheide    Festus J. Wade
"Thos. H. McKittrick   Breckenridge Jones.
"Andrew Sproule        Lorenzo Anderson
"L. D. Dozier          Murray Carleton
"Eben Richards, party of the second part,
        "The Nat'l Bank of Commerce in St. Louis,
            "by W. H. Thompson, Pres't.
                "party of third part."

The personnel of these underwriters and their relation to the buying and selling elements of the transaction are illustrated by the facts that Mr. Gehner

was the head of the firm of August Gehner & Company, owner of one of the plants to be purchased, Mr. West was president of the St. Louis Trust Company, the owner of another; Mr. A. A. B. Woerheide was an officer of the Lincoln Trust Company, the owner of another; Mr. W. H. Thompson and Mr. J. C. Van Blarcom, were respectively president and vice-president of the National Bank of Commerce; Mr. Festus J. Wade was president of the Mercantile Trust Company and Mr. Breckenridge Jones was vice-president of the Mississippi Valley Trust Company.

Some time before the execution of this contract defendant Richards, together with the defendant Holbrook, whom he represented in it, and another gentleman named Aikman Welsh, an employee in the title department of the Union Trust Company of St. Louis, the owner of another of the abstracts involved in the transaction, conceived the idea of consolidating all the eleven abstracts of title of the city of St. Louis under the ownership and management of a single corporation, and entered into a written contract between themselves for that purpose which could not be found and produced in evidence. They had secured options on most of them, which were taken in the name of Richards, with the exception of the Wenzlick plant, which had been taken in the name of Welch and was afterward transferred to Richards. What became of Welch, or which side he assumed in subsequent transactions, does not appear in the record.

On January 29, 1901, all the options had been secured. Their dates, amount and duration were as follows:

Union Trust Company ....Jan. 23, 1901, 20 days........$   80,000
Lewis & Hall ............Jan. 29, 1901, 20 days........   40,000
O'Reilly ................Jan. 24, 1901, 30 days........   40,000
Neudorf .................Jan. 24, 1901, 30 days........    5,000
Ahrons ..................Jan. 21, 1901, 30 days........    5,000
Babcock & O'Conner ......Jan. 19, 1901, 30 days........   25,000
Wenzlick ................Jan. 12, 1901, 30 days........   25,000

| | | |
|---|---|---|
| Wachtel ..................Jan. 18, 1901, 30 days........ | 40,000 |
| Lincoln Trust Company....Jan. 14, 1901, 30 days........ | 200,000 |
| St. Louis Trust Co. .......Jan. 19, 1901, 30 days........ | 300,000 |
| Gehner & Co. .............Jan. 12, 1901, 30 days........ | 400,000 |
| Total ....................................................$1,160,000 |

On January 24, 1901, the nine thousand shares of the capital stock of the proposed corporation which were, by the terms of the contract of January 24, to be offered and sold to the public, were disposed of by a written subscription, or agreement, or whatever it may properly be called, of the following tenor:

"St. Louis, Missouri, January 24th, 1901.

"The undersigned, each for himself, and not for the others, hereby agrees to purchase from Eben Richards (the owner and holder of 9000 shares of the capital stock of the Title Guaranty Trust Company of St. Louis, a corporation formed or to be formed, to own and operate the title plants in the City of St. Louis, Missouri, with a capital stock of $1,500,000, full paid, and a surplus of $750,000, as set out in the underwriting contract hereto attached), at the price of $150 per share, the number of shares of stock in said Title Guaranty Trust Company of St. Louis, set opposite the names of each respectively.

"And the undersigned each for himself, and not for the others, hereby agrees with Eben Richards, the owner and holder of said 9000 shares of the capital stock of said corporation, to pay for the number of shares hereby subscribed for by each, at the rate of $150 per share, upon the tender of a certificate in due form for said shares.

"Lincoln Trust Company,

"by Julius C. Garrels, treasurer ..  1,000 shares
"St. Louis Trust Company,

"by Thomas H. West, president ..  1,000 shares
"August Gehner & Company ........  1,000 shares
"Mississippi Valley Trust Company,

"by J. Walsh, president ........  1,000 shares

' Mercantile Trust Company,
    "by Festus J. Wade ..........    1,000 shares
' J. C. Van Blarcom ................    1,000 shares
" A. G. Edwards & Sons Brokerage Company,
    "by A. D. Grant, secretary ......    3,000 shares
                                                   "9,000 shares"

The articles of association of the new company are dated February 1, 1901, the shareholders named being all the parties of the first part to the underwriters' agreement, together with Gustave W. Niemann, a member of Gehner & Company, who had become a subscriber for sixty-seven shares which Pierce had agreed to take and defendant Holbrook who subscribed for 300 and defendant Richards who executed the articles of incorporation as subscriber for the remaining 12,700 of the 15,000 shares authorized. All these subscribers except Thompson were named as members of the first board of eighteen directors appointed by the articles. The purposes of the corporation were stated as follows:

"To certify and guarantee title to real estate; to loan money on real estate security; to buy and sell notes and bonds secured by real estate mortgages or deeds of trust, and to receive money therefor; and to act as trustee in deeds of trust conveying real estate as security for loans; and in general to exercise all the powers, rights and privileges necessary and incident to the proper carrying out of the above objects."

The articles were filed, and the certificate of incorporation issued on February 15, 1901. The first meeting of the shareholders was held on February 18th, at which by-laws were adopted which prescribed, among other things, a seal for the corporation, and provided that certificates of stock should be signed by the president and countersigned by the secretary, and sealed with the corporate seal, and should be issued by the secretary under such rules and regula-

tions as may be prescribed by the board of directors. The meeting also directed the purchase of the title plants from Richards at the price of one million seven hundred and fifty thousand dollars cash.

The directors met on the same day and organized by the election of Gehner as president, Richards vice-president, Wade second vice-president, Niemann secretary and Richards counsel. They also constituted defendants Jones and Woerheide, with the president and vice-president, the executive committee, and designated the National Bank of Commerce as the depository of the funds of the corporation.

The A. G. Edwards Brokerage Company was a corporation engaged in the business indicated by its name, of which Mr. George L. Edwards was president. Its relations were very friendly with the National Bank of Commerce, of which a brother of Mr. Edwards was cashier, and it kept its principal bank account there. At some time in January, 1901, and before the nineteenth day of the month, Mr. Edwards had several conversations with Mr. Van Blarcom looking to the acquisition by the brokerage company of stock in the corporation to be organized to engage in the title examining business. Mr. Van Blarcom told him that such a corporation was to be organized, and asked him to underwrite and purchase some of the stock, stating that the capital of the proposed company was to be a million and a half, with a surplus of seven hundred and fifty thousand dollars. The result of these talks was that Mr. Edwards agreed to purchase for his company any part of 6000 shares which might be assigned to him. He went to Colorado about January 19th, where he remained until March; but before going he left directions with Mr. Green, the secretary of the company, to subscribe for and take the stock and pay for it when notified by the bank of the amount and that it was ready. He was so notified and signed the paper above quoted on the 19th of February, re-

ceived the stock and paid for it with check in favor of the bank for four hundred and fifty thousand dollars. There is no tangible evidence that the brokerage company, to which the stock was issued in original certificates by the corporation, knew at the time of the contents of the underwriting agreement otherwise than by the reference to it contained in the paper upon which the subscription was made. Mr. Edwards testifies that he knew nothing about such an agreement while Mr. Green testifies that it was not attached to the paper which he signed, and that he never saw it, until after this suit was instituted. Their interest was centered in the fact that their customers were waiting impatiently for the stock, and wanted all they could get. Mr. Van Blarcom recommended it to the employees of the bank even while he was selling his own. The plaintiff purchased from the Edwards Company the hundred shares held by him which were transferred to him on the books of the corporation October 2, 1901. The evidence indicates that bonuses were paid to certain of the incorporators, other than that provided for in the underwriters' agreement, but as their amount is not involved in this case it is sufficient to say that the provisions of that agreement were carried out in the distribution, the defendant Holbrook participating in the amount received by Richards. At the time of the trial the stock had depreciated in value so that it was then worth, as variously stated by the witnesses, thirty, forty or fifty dollars per share.

## OPINION.

I. From the foregoing statement it is readily seen that this suit had its origin in an enterprise conceived by the defendants Richards and Holbrook "to consolidate, under one management, all the title plants of the city of St. Louis, in one corporation." The

most of the transactions were conducted in the name of Richards as promoter, and, for convenience, we will use his name in connection with the activities of both.

Before January 21, 1901, he secured options on eleven plants of the city, for various amounts aggregating one million one hundred and sixty thousand dollars, and with these and evident aptitude for such transactions as his initial capital, he continued his campaign to assemble all those other elements necessary to develop his enterprise to that fruitful condition, which is the hope of the promoter, when the public, with the confidence born of thrifty desire absorbs its securities. These elements included such financial arrangements as would enable him to secure the tesporary advancement of money for the organization of the proposed corporation, under the laws of this State, and to make his options available provided it should be needed for that purpose before the public should come to his rescue; and also an organization which should include the names of such persons and financial institutions as would inspire the confidence of the investing public in the soundness of its securities. The times were propitious. It was contemporaneous with the organization of the greatest industrial combination that the world has known, which has offered, in round numbers, one billion and a half dollars in par value of its securities to a responsive public, and the beginning of an era of industrial, mining, transportation and financial consolidation to which the public contributed with avidity. It was a matter of common knowledge generally disseminated not only by word of mouth and in the public press, but upon the public records, including the records of the courts, that in the creation of these combinations it was common to inflate their capitalization by additions to the value of the physical properties involved to meet not only the views of the modest promoter with respect to the value of his own services, but also to overcome the

reluctance and secure the cordial· co-operation of the owners of such plants and properties as were necessary to the complete success of the undertaking, and who should hold back until their importance to the project should receive pecuniary recognition. These were placed upon the ground floor in comfortable proximity to the promoter, while the public were often satisfied to depend for profits upon such abnormal earnings as they hoped would result from the absence of competition.

The first necessity in all such cases is a financial sponsor with a name of pecuniary value to its undertaking, and Mr. Richards had the great good fortune to secure in that capacity the services of the National Bank of Commerce. That the plan of organization contemplated this bank as the depository of the funds of the corporation and that of these there would be five hundred thousand dollars of working capital and two hundred and fifty thousand dollars of the surplus that would be left after the division of the profits, making in the aggregate a deposit of seven hundred and fifty thousand dollars, gave the bank a very considerable interest in its successful execution. It required, however, in accordance with the rule of good banking, that a cash margin should be provided as security for any loan it might be required to make in furtherance of the enterprise. For this purpose an underwriting syndicate was created to immediately subscribe and pay the bank for three hundred thousand dollars worth of the prospective stock. It consisted of sixteen gentlemen who were to be let in on the ground floor with Mr. Richards. Thompson and Van Blarcom, the president and vice-president of the bank, became members and entitled to their share in the division. Mr. August Gehner of Gehner & Company, who were to receive four hundred thousand dollars for their title plant if the thing went through, and Mr. Niemann, his partner, naturally put their should-

ers to the wheel to help it along, and became subscribers. The St. Louis Trust Company put its title plant into the consolidation at three hundred thousand dollars, the Lincoln Trust Company put one in at two hundred thousand dollars and the Union Trust Company put one in at eighty thousand dollars. All these helped the good work by having representatives in the underwriting syndicate. These sixteen gentlemen were a financial galaxy of which Mr. Gehner said in his testimony: "That made me go into the deal. When the names were shown to me, of course, then I agreed to go in." With Richards and Holbrook they are the defendants in this suit. It is no wonder that, as Mr. Green, the secretary of the Edwards Brokerage Company tells us, the people were clamoring for this stock before it was issued, and the only fault his house found was that it could not get enough of it to accommodate customers. The underwriting contract provided that the capital of the corporation should be one million five hundred thousand dollars divided into fifteen thousand shares of the par value of one hundred dollars each and that a surplus was to be provided from the stock amounting to seven hundred and fifty thousand dollars, or fifty dollars per share. The underwriters subscribed for two thousand shares, paying the bank therefor three hundred thousand dollars. In this way the nest egg was laid. The contract required that the bank should continue the process by selling nine thousand other shares through a broker or brokers to be appointed by it, at the same price, which would bring in one million three hundred fifty thousand dollars more. It was natural that it should choose the Edwards Brokerage Company as its broker. The company was "close" to the bank, the cashier of which was the brother of Mr. G. L. Edwards, its president. That their relations were otherwise intimate appears plainly from the testimony. In fact Mr. Grant tells us that matters O. K.'d by the bank the Edwards

Company would sign without scrutiny because it considered them absolutely all right.

Mr. George L. Edwards, president of the brokerage company, whose word seems to have been the supreme law in its councils, was, on January 19, 1901, about to leave St. Louis for a sojourn of several months in Colorado. On or about that date Mr. Van Blarcom made an oral arrangement with him by which he agreed to take six thousand shares of the stock of the proposed Title Guaranty Trust Company, or any part of that amount which should be assigned to him. This agreement was the first step looking to the final organization of the new corporation. It insured the success of the plan by demonstrating that the bank could dispose of the stock. After this the steps came in quick succession. On the 21st the underwriting contract was made in which the bank assumed the obligation to sell nine thousand shares of the stock, six thousand of which it had already placed with the Edwards Company. On the 24th it prepared the papers and secured the agreement of Gehner, Van Blarcom and four interested trust companies to take one thousand shares each, or six thousand shares in the aggregate, of the nine thousand. Under its agreement with Edwards it could complete this transaction by simply notifying Mr. Grant, the secretary of the Edwards Company, to come and pay for the stock. The next step in regular sequence was the organization of the new trust company. The bank had agreed to advance the money necessary for the purpose. At this point the State became a party to be reckoned with. Its Constitution and laws, in providing that corporations may be freely formed to transact practically all kinds of business which may be transacted by individuals, without personal liability on the part of their members, fully recognized the governmental duty to protect the public against fraud and imposition by substituting a foundation of credit consisting of business

capital, honestly paid, for personal responsibility, which is founded largely upon the honesty, self-respect and habits of thrift of individuals as well as upon pecuniary resources. Compliance with the conditions prescribed must be made a matter of public record, open to the inspection of all who may contemplate becoming. interested. While the requirements with reference to the payment of the capital stock in cash were imperative, there was no limitation upon the right of the incorporators to provide a "surplus" to be paid and used in any lawful manner upon which they might agree. It was accordingly stated in the articles of association, in which the parties to the underwriting agreement were the incorporators, stockholders and first board of directors named, that the capital stock of the corporation was one million five hundred thousand dollars fully paid in cash and all reference to the surplus of seven hundred fifty thousand dollars provided for in the contract was omitted. As is the practice in all cases in which a corporation is formed for the purpose of taking over property acquired and owned by its promoters it was contemplated that the money should be temporarily advanced to comply with the statute in this respect, with the agreement that it be repaid by the promoters when it shall have been received by them as the purchase price of the property. This plan was provided in the underwriters' agreement in this case. The bank agreed to advance the money for "purpose of organization," holding as security therefor the options upon the title plants, the subscriptions to the stock and all the capital stock when the corporation should have been organized. Richards was thereupon selected as the subscriber for the thirteen thousand shares not subscribed by the syndicate. The plan of organization was carried out according to the contract. The articles were filed and certificate issued February 15, 1901. Mr. Grant, the secretary of the Edwards Company and

the only officer of that corporation present in the city, was notified, and under his instructions from the company paid to the bank four hundred and fifty thousand dollars and signed the paper already signed by the subscribers for the other six thousand shares, in which it was stated, in substance, that the stock was purchased from Richards, owner and holder of the nine thousand shares, at the price of one hundred fifty dollars per share to be paid for upon the tender of the certificates. It also stated that the corporation was "to own and operate the title plants in the city of St. Louis with capital stock of $1,500,000, full paid, and a surplus of $750,000, as set out in the underwriting contract hereto attached."

II. The corporation was now full-fledged and ready to try its wings. The contract provided that the entire capital stock and surplus should be expended and applied as follows:

> "Estimated cost of title plants ....$1,167,500.00
> "Reserve for expenses of organiza-
>     tion ........................    82,500.00
> "Bonus of profit to parties hereto..   500,000.00
> "Cash working capital ............   500,000.00
> "Total ........................$2,250,000.00"

The stockholders and directors proceeded to carry it out.

The stockholders met and unanimously resolved that the corporation purchase from Richards the title plants at the price of one million seven hundred and fifty thousand dollars in cash. The directors then met, and completed the transaction by directing the president and secretary "to do all things necessary to complete said purchase and transfer." Thus these gentlemen had provided, without the intervention of dummy stockholders or directors, or other apparently

disinterested agencies, in the name of Richards, a fund from which to pay themselves, out of the assets of the corporation, five hundred thousand dollars as their profit in the transaction they had so successfully completed, and they proceeded to take it while as yet they were not only the claimants, but officers, directors and stockholders combined, with nobody present to gainsay them. The claim of Richards seems to have been founded upon the skill and industry he had exercised in procuring the options for the title plants and framing the organization. The claim of the sixteen was more complicated and difficult to describe. That of Gehner and the representatives of other owners of the title plants seems to some extent to depend upon their difficult position as both sellers and buyers. They evidently believed that they were entitled to something for having permitted Richards to purchase their plants, and for helping him to obtain the money to pay for them. The others seem to have earned their part of the bonus by contributing their names to conjure by. They tried it on Gehner with the result that it produced in him a controlling desire to be permitted to join them in the transaction. They were, if we may be permitted the expression, the first fruits of Richards' enterprise, and it was reasonably expected that they would be followed by the many who believed in their financial acumen. This expectation was realized; for the evidence discloses that those who were in on the ground floor proceeded to dispose of their stock, and we have some foundation upon which to form an opinion as to prices obtained in the fact that the plaintiff, then an employee of the National Bank of Commerce, purchased from the Edwards Company the hundred shares on the ownership of which he attempts to found his title to maintain this suit, about eight months after the organization, at one hundred fifty-seven dollars per

share.  At the time of the trial its nominal value had decreased to thirty, forty or fifty dollars per share, leaving the plaintiff and those similarly situated in the position indicated by these figures.  These shares are a part of the three thousand shares assigned to and taken by the Edwards Company.

III.  The question thus presented is whether or not this taking, by the members of the board of directors of five hundred thousand dollars worth of the stock was a wrong against the corporation for which it is entitled to have redress.  As we have already seen, it did not necessarily constitute any part of the amount which the statute required to be paid in cash upon its incorporation.  It did, however, belong to the corporation, and was a part of its capital which the board of directors were bound to protect and administer.  In doing this they occupy a position of the highest trust and confidence. ''They have no right, under any circumstanes, to use their official positions for their own benefit, or the benefit of anyone except the corporation itself.  It is for this reason that the directors have no authority to represent the corporation in any transactions in which they are personally interested in obtaining an advantage at the expense of the company.  .  .  .  Accordingly, it has been held, in numerous cases, that the directors of a corporation have no authority to bind the company to any contract made with themselves personally, or to represent it in any transaction with third persons in which they have a private interest at stake.''  [Hill v. Rich Hill Coal Mining Co., 119 Mo. 9, 21; quoting 1 Mor. Priv. Cor. (2 Ed.), secs. 516, 517.]  In that case we supplemented the above quotation with the following statement: ''Upon the principle thus announced this court has always firmly stood;'' and this statement is as true now as when it

*Directors.*

was written. In such cases the law "does not stop to inquire whether the contract or transaction was fair or unfair. It stops the inquiry when the relation is disclosed, and sets aside the transaction or refuses to enforce it, at the instance of the party whom the fiduciary undertook to represent, without undertaking to deal with the question of abstract justice in the particular case." [Id., p. 24; quoting Munson v. Railroad, 103 N. Y. 73.] It is a self-evident moral and legal proposition that the defendants acquired no right through the action of the board of directors in purchasing the title plants from Richards at the price of one million seven hundred and fifty thousand dollars so far as it added the sum of five hundred thousand dollars to the purchase price for their own benefit. Their duty to refund that amount to the corporation must be considered solely with reference to the rights which they possess independently of that action.

IV. It has been frequently held by this court that the promoters "who project and form a corporation, by soliciting and procuring others to subscribe for and take shares of stock, for the purpose of selling or turning over to the company property which they own, or have a right to acquire by executory contract, do occupy a double position. On the one hand they represent their own interest in respect to the disposition of the property; on the other, they represent the proposed corporation." [Exter v. Sawyer, 146 Mo. 302, 322; South Joplin Land Co. v. Case, 104 Mo. 579; Lumber Co. v. Crommer, 202 Mo. 504, 518.] In the case last cited the court, quoting from Cook on Stock and Stockholders, says: "A promoter is a person who brings about the incorporation and organization of a corporation. He brings together the persons who become interested in the enterprise, aids in procuring subscriptions, and sets in motion the machinery which leads to the formation

**Promoters.**

of the corporation itself.'' It also cites from 23 American and English Encyclopedia of. Law [2 Ed.], p. 232, the following definition: ''A promoter is a person who takes such preliminary steps in the formation of a corporation as to bring himself into a fiduciary relation thereto, analogous to that of trustee and *cestui que trust*.'' We also said: ''Our court has adopted practically the same definitions.'' There is, however, no magic in the word ''promoter'' which solves the relation of one who takes upon himself the burden of forming a corporation, either to the associates who may enlist with him in the prosecution of the work, or to the corporation in which all their interests will be combined upon its successful completion. This relation will depend upon the nature of the work and the contractual relations either expressed or implied which he assumes with respect to others interested in the common object. The corporation has no entity other than that which results from the legal union in its artificial personality, of these interests, and we must search among these interests to find its equitable status as their common repository. In doing this we shall follow, to some extent, the example of a distinguished judge of a most distinguished court in a similar inquiry, and, without spending time upon the many *dicta* that have been quoted to us, we shall endeavor to weigh the considerations on the one side and the other afresh. [Old Dominion Copper Company v. Lewisohn, 210 U. S. 206, 211.] They are here grouped around one of those transactions which have become as familiar to the public as the ordinary processes of barter, and which are called, in the vernacular of the period in which they were born, ''big business'' and ''high finance.'' Their chief characteristic is the use of corporate organization to make the savings of the people available in obtaining liberal compensation for a knowledge of the system.

Our first question is whether the steps taken in the formation of this corporation by the defendants brought them into a fiduciary relation to it. Equity is particularly solicitous of the rights of those who place their money or property in the hands of others to be managed for them. In such a case the party so receiving it holds it upon a trust, although there may be no express agreement to that effect. The relation arises out of the nature of the transaction and applies to all cases that come within its reason, whether the transaction be a joint one for the benefit of both, as in case of a partnership, or a mere agency for the benefit of the owner of the fund. In neither case can the agent or trustee deal with it for his own benefit except upon a full disclosure to his principal or beneficiary of all facts and circumstances relating to his own interest, and in the absence of undue influence or advantage arising out of the fiduciary relation. All this flows logically from the proposition that one has no right to convert to his own use the property of another without the free permission of the owner. The plan of Richards was "to consolidate, under one management, all the title plants of the city of St. Louis, in one corporation." It is by this plan, beginning in its conception, and to end in a great corporation in which all these plants should be merged, that the subsequent acts of the defendants, and all the agencies employed by them must be judged; for they are the steps by which the single object was to be and was finally attained. The subscription of the Edwards Company was a part of the original plan of financing the undertaking, and was evidently the most important and far reaching of any single element in contributing to its success. Although in organizing the corporation it was thought best that Richards should become the subscriber for the entire capital stock except the two thousand shares subscribed by the members of the underwriting syndicate,

*Profits to Promoters: Disclosure.*

yet in making the subscription he acted in the capacity of agent and trustee for its distribution under the general plan provided in the agreement—the conduit through which it passed to its destination. He was, up to the time the corporation was completed, the agent and trustee of his associates whose money and credit he was using in furtherance of his scheme. When their interests were vested in the corporation it became the beneficiary, and was entitled to the honest execution of the trust in its own favor. The proceeds of the 3333 shares retained by him as bonus were the property of the corporation, unless, upon a full and fair disclosure of the circumstances of his claim and the claims of his codefendants, all the members had consented to its diversion, for they had no right to otherwise derive any advantage over the other members. This doctrine is too firmly established in this State and too well founded upon principle and general authority to be now disturbed, and it represents a sound public policy with which we are still perfectly satisfied. It would be pedantry to encumber this opinion with a repetition of authorities that have been so often cited in a form readily available to all, but we will refer to Old Dominion Copper Company v. Bigelow, 203 Mass. 159, and Lomita Land and Water Company v. Robinson, 154 Cal. 36, with notes as published in 18 L. R. A. (N. S.) 1106, for a full discussion and extensive citation of authorities which have been of great service to us in this investigation. It is suggested that in Old Dominion Copper Company v. Lewisohn, 210 U. S. 206, a different doctrine was held, but we do not so understand that case. It was evidently decided upon the ground that at the time the stock of the corporation was issued to the promoters and distributed among them no one else was interested, either directly or indirectly, in it or its property. It gives no authority to disregard the rule stated by the same court in Dickerman v. Northern Trust

Company, 176 U. S. 181, 204, in which it is held that the promoter stands in a confidential relation to the proposed company; that he is its agent, in short, and subject to the disabilities of an ordinary agent. On that subject the court said: "His acts are scrutinized carefully, and he is precluded from taking a secret advantage of the other stockholders. [Cook on Stock and Stockholders, sec. 651.] 'Accordingly, it has been held that, if persons start a company, and induce others to subscribe for shares, for the purpose of selling property to the company when organized, they must faithfully disclose all facts relating to the property which would influence those who form the company in deciding upon the judiciousness of the purchase. If the promoters are guilty of any misrepresentation of facts, or suppression of the truth in relation to the character and value of the property, or their personal interest in the proposed sale, the company will be entitled to set aside the transaction or recover compensation for any loss which it has suffered.' [Morawetz on Corporations, secs. 291, 294, 546; New Sombrero Phosphate Co. v. Erlanger, 5 Ch. Div. 73; Bagnall v. Carlton, 6 Ch. Div. 371; Emma Silver Mining Co. v. Grant, 11 Ch. Div. 918.]"

If this rule, which we consider to be firmly established by an overwhelming weight of authority, is to be so changed as to facilitate the fictitious capitalization of corporations, in the hope that the value of the stock may be maintained by combinations and influences which will enable them to exact from the public and pay dividends on such fictitious values, it should be done by legislatures rather than by courts.

V. It is said, however, that the members of this corporation, in the division of the capital stock and its proceeds, were dealing with their own, and could divide it as they pleased. They owned the whole, and if they could devise some plan by which each one of them could receive more than his share, there would

be nobody left who would have the right to complain.
The cruse from which the oil was poured might be re-
plenished whenever the public should be favored with
the opportunity to purchase such highly recommended
securities.   In this process the purchaser would have
the burden of ascertaining for himself the condition
of the corporation and the value of its stock.   The
duty of the promoter would be performed and his con-
science at rest, when he had made full disclosure of
his profit, and secured the free consent of those who
became interested as a part of his original plan, and
furnished any part of the funds used to carry out his
scheme to launch the corporation.   The plaintiff in
his brief agrees to this proposition as we have stated
it, and it remains to consider whether such disclosure
was made, and consent was obtained, in this case.   It
cannot be denied, nor is any attempt made to deny, that
all those who can be said to have been stockholders
in the corporation at the time of the distribution, were
not only aware of the plan, but were either by them-
selves or their representatives interested in the profits
through the underwriters' contract, excepting only the
Edwards Brokerage Company; so that its position
in this respect becomes the leading feature of the
controversy.   Unless it could complain, the present
plaintiff, suing in the right of the corporation, every
other member of which had consented to and partici-
pated in the transaction, cannot maintain this action.
Although the evidence shows that the stock for which
he paid fifteen thousand seven hundred dollars de-
preciated, while he has held the bag so to speak, until
the highest value suggested in the evidence is six thou-
sand eight hundred and fifty dollars, and the attorneys
who cross-examined him seemed delighted to show
that he had taken it from bank to bank as collateral,
all this is attributable to error in judgment in making
the investment, or to the fortunes of the market in spec-
ulation, so far as his rights in this suit are concerned.

He can only recover here upon the right of the corporation derived through the Edwards Company.

The A. G. Edwards and Sons Brokerage Company was a corporation engaged, as its name indicates, in the stock and bond brokerage business. Its financial standing and ability are indicated, to some extent, by the fact that it was able to pay and did pay four hundred fifty thousand dollars upon a casual notice that the stock was ready, and stood ready to pay twice that amount if a corresponding amount should be assigned to it. It did not take the securities as an investment, but as a broker and dealer in the regular course of its business. Its relation to the bank was such that it did not ordinarily consider it necessary to investigate such securities as that institution offered. In this case Mr. Edwards, its president, did not inquire what others were paying for the stock, or the particulars of its capitalization except the amount. That Mr. Green was not only charged with the completion of this important transaction, but was the ranking officer present and in general charge of his company's business at the time, is sufficient evidence of his authority with respect to its details. He read the subscription which he signed, and says that he noted at the time that the transaction purported to be a purchase of the stock from Richards, and not an original subscription; and also noted the reference to the underwriting contract mentioned in direct connection with the capitalization, and purporting to be attached. All those circumstances are perti-

Notice.

nent to the question whether the Edwards Company had notice of the facts that plaintiff contends are at least a constructive fraud upon the corporation, because they were a fraud against that company; for if it had such notice, and paid its money without protest, it ought to be held to have consented to that which it knew had been done. The plaintiff suggests that the notice which would so bind it should

be actual as distinguished from constructive. What constitutes actual notice is by no means a constant quantity. Should one stop his ears to prevent being told, or flee to avoid being approached with such information he ought not ordinarily to escape the imputation of the knowledge he purposely avoided. In this case it seems to us that the Edwards Company stood in about the same position. It was expert or will be presumed to be expert in the matters relating to its own business affairs. All the means of information were ostentatiously spread out before it and it refused to look. Its refusal is now placed in the evidence upon a ground inconsistent with the complaint of the plaintiff that it was wronged, for its representatives testified, in substance, that they wanted the stock for sale, presumably at a profit, to brokers and cusomers who were clamoring for it. While the protection of the law is, in proper cases, often extended to those who are permitted by the cunning wrongdoer to deceive themselves, it is always under circumstances in which the one so defrauded lacks either the ability or opportunity to protect himself. It would be absurd, it seems to us, to extend our wings over the Edwards Company under the circumstances detailed in this evidence. We can find no reason why the rule that when a written contract refers to another written or printed instrument the latter is made part of the contract should not be applied to it. [St. Louis v. Laclede Gas Light Company, 155 Mo. 1, 17, and cases cited.] The plaintiff, standing in its shoes, will for that reason have to be denied the relief he asks. The judgment of the St. Louis Circuit Court is therefore affirmed.

PER CURIAM.—The foregoing opinion by BROWN, C., is adopted as the opinion of the court. All concur except *Bond, J.,* not sitting; *Woodson, P. J.,* in separate opinion.

254 Mo. 11

## CONCURRING OPINION.

WOODSON, P. J.—I concur only in the result reached in this case; and dissent to almost everything else contained therein.

While as to the principles of law announced therein, as abstract propositions, I have no complaint to make, because they are wise, sound and just, yet they have no application to this case.

While the opinion does not state the fact, nevertheless it is a fact, that the plaintiff was not one of the organizers of the trust company mentioned who had paid his money into the coffers thereof believing and understanding, as he had the legal right to do, that he was bearing his proportional part of the burdens, and was receiving his proportional part of the benefits thereof with the other organizers; but he was a total stranger to the transaction, and went out into the open market and purchased his stock upon his own judgment; and neither the corporation nor its officers or agents owed him any duty whatever in the transaction.

If the law is as stated in the opinion of our learned Commissioner, then I can to-day go into the open market and purchase a share of stock in the United States Steel Company (in the language of the Commissioner "the greatest industrial combination that the world has known, which has offered, in round numbers, one billion and a half dollars in par value of its securities to a responsive public") and sue and recover in dollars and cents, from the stockholders, officers and directors thereof, who knowingly participated in so deeply watering the capitalization of that company, the proportional part of that fictitious capital that my share of stock would bear to the whole amount thereof.

That is not only true of the United States Steel Company, but it is largely true of almost all other great industrial institutions of the country.

However just that doctrine as an original proposition may have been, yet in this day and age, with the conditions being as stated, such a rule would be intolerable, unjust and oppressive; and I know of no respectable authority holding to the contrary.

The cases cited by our learned Commissioner, if I correctly understand them, have no reference to cases where the purchase was made from third parties upon the open market, after the corporation had been completely organized, as was done in this case, but relate to transactions had between the promoters and organizers of a corporation.